## The People v. Jacob Stubenvoll.

*Criminal law—Information for murder—Properly filed where testimony tends to prove the commission of that crime—Conviction may be had for any lesser offense, down to assault and battery, as character and grade are shown on the trial—See page 332 of opinion for instructions held correct on this point—" Reasonable doubt"—Not of such unknown signification as to require an exposition of its meaning by trial judge—A doubt of the guilt of a respondent, honestly entertained, is a " reasonable doubt"—Where a respondent chased a boy of fifteen years, intending to slap his face and to shoot a loaded pistol in the air to scare him and other boys—And fires the effects of which shot the boy dies— He is at least guilty of manslaughter, whether he intended to kill the boy or not—See head-note 5 for doctrine deducible from adjudicated cases— Verdict for " voluntary manslaughter"—Reformed by clerk's asking jury if they found respondent guilty of manslaughter in manner and form as charged in the information—To which inquiry an affirmative answer was given—Is sufficient to sustain a judgment for that offense.*

1. Where the testimony tends to prove the respondent guilty of the crime of *murder*, it is competent for the public prosecutor to file an information *simply* for *that* crime, and leave the matter to be dealt with as the proof shall disclose the character and grade of the crime committed, which might range all the way from *murder* in the *first* degree down to a simple *assault and battery.*

2. The instructions given to the jury (see page 332 of opinion) presented the law of the case correctly.

3. The phrase "reasonable doubt" is not of such unknown or uncommon signification as to require an exposition of its meaning by a trial judge. Language within the comprehension of persons of ordinary intelligence can seldom be made plainer by further definition or refining. All persons who possess the qualifications of jurors *know* that a "doubt" is a fluctuation or uncertainty of the mind arising from defect of knowledge or of evidence, and that a doubt of the *guilt* of the accused, *honestly entertained*, is a "*reasonable doubt." Hamilton v. People*, 29 Mich. 194.

4. Where by a respondent's own testimony, given on his trial for murder, it appeared that he chased the deceased, a boy fifteen years old, in the highway, with *intent* to slap him in the face, and to shoot his pistol, a deadly weapon loaded with powder and ball, in the air for the purpose of scaring him and other boys, and did fire the pistol, from the effects of which shot the boy died,—

   *Held*, that respondent was at *least* guilty of *manslaughter*, whether he *intended* to *kill* the boy or not.

5. The doctrine deducible from the adjudicated cases is as follows:   "If
   an act (causing death) is *unlawful*, or is such as *duty* does not de-
   mand, and of a *tendency* directly *dangerous* to life, however unin-
   tended, it will be murder. But if the act, though dangerous, is
   not *directly* so, yet sufficiently dangerous to come under condemna-
   tion of the law, and death *unintended* results from it, the offense is
   manslaughter; or if it is one of a nature to be lawful *properly* per-
   formed, and it is performed *improperly*, and death comes from it
   unexpectedly, the offense still is manslaughter." 2 Bish. Crim. Law,
   § 689.
6. Where, on the trial of a respondent for murder, the foreman of the
   jury announced to the court that they found the respondent guilty of
   "voluntary manslaughter," whereupon the clerk asked the jury if they
   found him " guilty of manslaughter in manner and form as the peo-
   ple have in their information charged," to which inquiry an affirm-
   ative answer was given by the entire panel,—
   *Held*, not error.

Error to Saginaw.   (Gage,  J.)   Argued June 23, 1886.
Decided July 8, 1886.

Information   for   murder.   Convicted of manslaughter.
Affirmed by an equal division of the Court.  (Campbell,
C. J., and Morse, J., dissenting.)   The facts are stated in
the opinion.

*Tarsney & Weadock* (*George Gartner*, of counsel), for
respondent.

*Moses Taggart*, Attorney General, for the People.

CHAMPLIN, J.   An information was filed against the re-
spondent for the murder of William Pickel, and upon a
trial the jury returned a verdict of manslaughter.

The death was caused by a pistol ball discharged by re-
spondent, as he claims, for the purpose of frightening the
deceased; and that he intended to shoot over Pickel's head,
but, by accident, the ball took effect in Pickel's body, and
he soon expired.

The Legislature, in 1869, passed an act entitled " An act
to prevent the careless use of fire-arms."

The first and second sections of this act make it a misde-
meanor for any person, intentionally and without malice, to

point, aim, or discharge any fire-arm, without injury, at another person. The third section enacts:

"Any person who shall maim or injure any other person by the discharge of any fire-arm, pointed or aimed, intentionally but.without malice, at any such person, shall be guilty of a misdemeanor, and shall be punished by a fine of not less than fifty dollars, or imprisonment in the county jail for a period of not more than one year; and if death ensue from such wounding or maiming, such person so offending shall be deemed guilty of the crime of manslaughter."[1]

The counsel for respondent requested the court to charge the jury:

"If you find that the death of William Pickel resulted from the accidental use, or careless use, of the revolver in the hands of the defendant, without malice, you must acquit him of any offense, under the information in this case, and your verdict will be 'not guilty.'"

And again:

"If you find, as a fact, that the defendant did not intend to do any bodily harm to. the deceased, but, through careless use of a revolver, death resulted, he is not guilty of murder in any degree, nor of manslaughter, under the information against him in this case, and it will be your duty to acquit."

These requests the court refused to give. They were rightly refused. The public prosecutor was not compelled to frame his information under the third section of the statute cited. The testimony of the prosecution tended to prove murder. It was competent for the prosecutor to file his information simply for murder, and leave the matter to be dealt with as the proof should disclose the character and grade of the crime committed, which might range all the way from murder in the first degree down to a simple assault and battery. The statute has nowhere attempted to define the crime of manslaughter, but has left the offense as known at the common law, and this the court properly defined.

---

[1] How. Stat. § 9112.

He also told the jury that, under the evidence, there could be no conviction for murder in the first degree, and, after defining the different degrees of murder and of manslaughter, he instructed the jury as follows:

" If you find, at the time of the homicide, that the defendant intentionally discharged a pistol at the person of Willie Pickel, while Pickel was running in the highway, with malice in his heart at the time, and that such malice was the moving cause of the act, and as a result of the shot Willie Pickel received a wound from the effects of which he died, the defendant is guilty of murder in the second degree.

" If you find that the defendant was chasing Willie Pickel in the highway, with the intention to compel him to seek a place of shelter from the defendant, and for the purpose of frightening him he discharged a pistol, not intending to inflict any personal injury upon Willie Pickel, but only to frighten him, the defendant was engaged in an unlawful act; and if you find the shot did inflict an injury from which Willie Pickel died, the defendant is guilty of manslaughter.

" If you find that the defendant was chasing Willie Pickel in the highway, intending to overtake him and inflict some personal chastisement on him, and while so chasing him designedly discharged a pistol, not intending to inflict any injury on Pickel by such discharge, but only to frighten him, and as a result of the shot a wound was inflicted on the person of Willie Pickel from the effects of which he died, the defendant is guilty of manslaughter."

These instructions presented the law of the case correctly to the jury.

The court also instructed the jury as follows:

" The burden of proof is upon the people, who make the charge, and you are required to be satisfied beyond a reasonable doubt of the guilt of the defendant, and of the degree of guilt that you find. What is meant by a 'reasonable doubt' is, as the term implies, a doubt arising out of the facts and circumstances of the case in maintaining which you can give some good reason."

That portion of the charge defining " reasonable doubt," and especially the last clause, is excepted to by the counsel for respondent. Many efforts have been made to define the expression " reasonable doubt," and hitherto I think the definitions given are not remarkable for clearness of thought or

accuracy of expression. They appear generally to be in-
volved in the uncertainty of the subject which they are
attempting to define, and it is much easier to say what is not
a correct definition of the term than to determine the precise
signification of the expression as used in the trial of criminal
cases.

The following explanation of the term was not disapproved
by Mr. Justice CAMPBELL in *McGuire v. People*, 44 Mich.
286 :

"The expression itself seems to comprehend the whole
subject-matter, '*reasonable* doubt.' Of course, that is not a
far-fetched one. It is not a speculative one; it is not an
arbitrary one; but it is just what it assumes to be, a 'reason-
able doubt.' If you, after looking over the testimony, and
considering all the facts proven to your satisfaction in the
case, and the natural circumstances that surround those facts,
—if you are still unable to say that the prisoner is guilty, it
is your duty to acquit. And that, we apprehend, is what is
understood by 'reasonable doubt,' in the law."

And the following instruction as to what was meant by
"reasonable doubt" was approved by CAMPBELL, C. J., in
*People v. Finley*, 38 Mich. 482, viz.:

"A 'reasonable doubt' is a fair doubt, growing out of the
testimony in the case. It is not a mere imaginary, captious,
or possible doubt, but a fair doubt, based upon reason and
common sense. It is such a doubt as may leave your minds,
after a careful examination of all the evidence in the case, in
that condition that you cannot say you have an abiding con-
viction, to a moral certainty, of the truth of the charge here
made against the respondent."

While Mr. Justice Graves, in *People v. Marble*, 38 Mich.
at page 125, considered the following instruction misleading
and inaccurate, viz.:

"What I mean by a 'reasonable doubt' is that it must be
such evidence as would satisfy you,—as you would be willing
to act upon in any of your own important concerns, your
own business. Such evidence as would satisfy you it would
be proper for you to act upon in any of your own private
concerns,—that would be evidence that would satisfy you
beyond a 'reasonable doubt.' That is what this means."

We do not think that the phrase "reasonable doubt" is of such unknown or uncommon signification that an exposition by a trial judge is called for. Language that is within the comprehension of persons of ordinary intelligence can seldom be made plainer by further definition or refining. All persons who possess the qualifications of jurors know that a "doubt" is a fluctuation or uncertainty of mind arising from defect of knowledge or of evidence, and that a doubt of the guilt of the accused, *honestly entertained*, is a "reasonable doubt."

We repeat here what was said by Mr. Justice CAMPBELL upon this subject in *Hamilton v. People*, 29 Mich. at page 194, namely:

"But we do not think that juries can derive any help from attempts, by numerous and complicated requests, to explain what would be very much plainer without them. If a jury cannot understand their duty when told they must not convict when they have a reasonable doubt of the prisoner's guilt, or of any fact essential to prove it, they can very seldom get any help from such subtleties as require a trained mind to distinguish. Jurors are presumed to have common sense, and to understand common English; but they are not presumed to have professional or any high degree of technical or linguistic training."

Conceding, in this case, that the exposition of the phrase by the circuit judge was not strictly accurate, yet it is apparent that it could have produced no practical consequence in this case.

Stubenvoll was sworn in his own behalf, and we give his testimony in full, as appears in the record before us.

He testified that he was thirty-three years of age; that he was at the time of the shooting, and for some time previous had been, engaged by the East Saginaw Gas Light Company, inspecting meters, from the south side of Genesee avenue to the south end of town, in business blocks and residences. "We call it 'taking statements.' Keep a memorandum-book showing amount of gas consumed.

"I purchased the revolver, and carried it, because I had been attacked one night on Warren street after I had been taking statements. I drank beer regularly in the old coun-

try, and have drunk beer daily since I came to this country. I drank some on the night Willie Pickel was shot. Was sober that night. I quit work that night before six o'clock, and did not go home to supper. I had no lunch,—had nothing to eat. After quitting work I went to Zeigner's saloon, and bought a small bottle of beer, and drank it all myself, and went to the gas office, and then back, and drank another small bottle of beer. I then went to another saloon, and found Frey and Wobus there, and here drank two glasses of beer; and from there went to Zeigner's, and we there drank two more bottles of beer.

"Mr. Frey, Mr. Wobus, and myself—all neighbors—started for home together, talking and joking on the way. When we came to the fire Frey spoke to the boys. Asked them if they did not know it was against the law to have a bonfire in the city. I don't know who answered him. Then Mr. Rider came along, and asked me to go home. I waited to see if Frey would come too. I was behind the popple tree. I went there to urinate. I had my pipe and tobacco in my hands. The tree was between me and the road. I filled my pipe, turned around, and saw Frey talk with a couple of boys. I stepped back, and said : 'It is no use to fool about it, make the fire out;' and stepped down to the fire, and made it out with my feet. In the meantime some of the boys were throwing dirt or stones. One hit me on the leg. Didn't hurt me much ; and, in the meantime, they called us Dutch sons of bitches, and so on. Seven, eight, or ten stones fell around me. I did not pick Frey up. The boys ran in all directions. The dirt they threw on me came from the direction of McCoskry street.

" Then I ran to the middle of the road, and tried to keep them back. I did not say anything to the boys, nor curse, nor swear, and did not act angry or mad with them. I had no difficulty with the boys; had no difficulty with Pickel. I had never seen or known him before that evening. Willie did not tell me I could not sneak on him. I did not have a revolver in my hand when I crossed the street. Four or five boys ran out McCoskry street. They were every way. Some got over the fence. I was trying to scare the boys,—chasing them back.

" When the boys were running away from me I could tell their forms. I could not tell Will Pickel from the other boys. The boys were about one hundred feet ahead of me. I just got to the end of McCoskry street when I took my revolver out of my pocket. I did not take it out before that

time.  I did not aim the revolver at any of the boys.  I took the revolver out, and the moment I took it out—I don't know how it happened—it went off.  I took the revolver out of my pocket to shoot in the air to scare the boys.

"I heard the testimony of the two boys that I held the revolver in front of me.  I don't think it was so.  I just took it out.  The way I held it when it went off I couldn't tell.  My revolver was self-cocking.  It don't work very hard.  I did not intend to shoot anybody, or do any harm. When it went off I was scared.  I looked ahead, and saw him on the ground, not sitting up and not lying down.  I went to Will Pickel.  When I found him lying there I spoke to him and said, 'What is the matter?'  He said he was shot.  I said, 'My God, it can't be possible!'  He said, 'Yes, it is.'  So I took my arm around him, and he said he lived right there, in Pickel's house.  I helped him, and got him along.  I helped him to Lemme's house, and I thought he was dead when I laid him down.  I took the boy to an open door.  All I know there were two ladies come to meet me there.  The house I took Willie to was in the direction he pointed.  I went across the field to my house.  Gave the revolver, my watch, and pipe to my wife.  Then went to Frey's house and asked him to go to the police station, and I gave myself up to the policeman, and told him what I had done.  When I commenced running I had not taken my revolver out.  I was from eighty to one hundred feet from Willie when the revolver went off.  I did not say to Willie Pickel, when running, 'I will teach you to make fun of me.'"

*Cross-examination:* "I never had any trouble with the boys.  The revolver was a 36-calibre.  I never shot the revolver by cocking it first.  Never owned or carried a revolver before this one.  I did not tell Pickel to shut his mouth.  I drank beer in different places, but I was sober that night.  The reason I did not light my pipe under the tree was because I had no match.  When I turned and went to the bonfire the boys were talking angrily.  I was not very angry, but I did not want to be called names.  I was trying to scare the boys and stop their throwing.  If I had caught them I might have slapped them in the face and told them what was right.  Did not take the revolver out by the tree and fix it.  Did not hold any of the boys.  I never shot at anybody or in the direction of other men."

By his own statement he was armed with a deadly weapon,

and, being so armed, he gave chase to the deceased, and if he had caught him he might have slapped him in the face and told him what was right. He was not very angry, but he did not want to be called names. He was trying to scare the boys, and stop their throwing dirt or stones. He took his revolver out to shoot in the air to scare the boys, and when he took it out to do this, while he was pursuing and the deceased fleeing from him, about one hundred feet distant, he says he does not know how it happened, but it went off, and hit and killed the boy Willie Pickel. He also shows that there was an altercation there between him and the boys, they calling names and throwing dirt or stones, one of which hit him on the leg.

It thus appears from his testimony that he meant to do two things, both of which were unlawful:

1. He chased the deceased with intent to slap him in the face, or, in other words, to do him bodily harm.

2. He meant to shoot his pistol—a deadly weapon, loaded with powder and ball—in the air for the purpose of scaring the boys.

Under such circumstances, if death of a person ensues from the act, the crime is, at least, manslaughter, whether he intended to kill the person or not. It seems to me that it would be monstrous to hold that the respondent is not legally responsible for such criminal carelessness as his own story shows he was guilty of. Can it be that human life has come to be so cheap that it can be sacrificed without provocation, and the slayer go unpunished because he did not intend to take life by his rash or careless act? And yet such was the effect of the respondent's requests to charge the jury above quoted.

Mr. Bishop, in his work on Criminal Law, says:

"It is reasonable to hold that, where one uses a deadly weapon without justification, he evinces a disregard for human life and safety amounting to 'malice.'"

Was there any justification for the use of the deadly weapon in this case? Assuredly not. Its use was uncalled for and wanton. The boy chased and killed was but fifteen

years old.   He had committed no crime, and respondent had no right to lay violent hands upon him,—much less to shoot him.

In the case of *State v. Smith*, 2 Strob. (S. C.) 77, the prisoner fired a pistol at a person on horseback merely to frighten his horse and cause it to throw its rider, and the ball caused the death of another person.   The offense was held to be murder.   Mr. Justice Evans, in deciding the case, said :

" If the prisoner's object had been nothing more than to make Carter's horse throw him, and he had used such means only as were appropriate to that end, then there would be some reason for applying to this case the distinction that, where the intent was to commit only a trespass or a misdemeanor, the accidental killing would be only manslaughter."

The above case, in many of its features, is quite similar to this.   The occurrence happened after dark.   A crowd had assembled in the street, among which was the prisoner. Two children had been sent upon an errand, and, meeting the crowd, had climbed upon the fence, and sat there.   Carter rode by upon horseback.   The prisoner discharged his pistol, and accidentally hit and killed one of the children. The prisoner said that he did not know that the child was there, and would not have hurt him for the world if he had known it.   Again, being asked, when he said he did not mean to kill the negro, " Well, who did you mean to kill ?" he hesitated and said :   " Really, I did not intend to kill anybody.   I shot at that d—d mulatto, but did not intend to kill him."   Again, he said :   " I shot with this intention : to make Carter's horse cut or caper, and throw him down ; and I thought I had elevated the pistol high enough to be out of danger."   And again :   " I designed a frolic, to scare Carter or his horse, and thought I had raised the pistol so as not to hit anybody."

In this case, if the object of respondent was simply to frighten the boy, the means used were entirely inappropriate for the purpose.   If that had been his only object, his giving chase seems effectually to have accomplished it, for they were fleeing from him ; and for what reason other than

affright? The people's testimony showed that the respond-ent made threats, and had deliberately taken his pistol from his pocket while behind the tree, and that he pursued, and deliberately took aim, and fired the fatal shot. I think there was testimony in the case that would have justified the court in submitting it to the jury whether the respondent was not guilty of murder in the first degree.

Adverting again to decided cases: It has been held that where a parent corrects his child, if the correction exceeds the bounds of due moderation, either in the measure of it, or in the instrument made use of for that purpose, it will be either murder or manslaughter, according to the circum-stances. *Rex v. Cheeseman*, 7 Car. & P. 455; *Anony-mous*, 1 East, P. C. 261; 1 Hale, P. C. 455; Foster, 262.

In *Wigg's Case*, 1 Leach, 378, a boy having the care of some sheep suffered some of them to escape through the hurdles of the pen, and the master, seeing the sheep escap-ing, ran towards the boy, threw a stake at the boy, which hit and killed him. The jury, under the direction of the court, found the master guilty of manslaughter.

In the case of *Rex v. Sullivan*, 7 Car. & P. 641, a lad, in frolic, without meaning harm to any one, took the trapstick out of the forepart of a cart, in consequence of which it was upset, and the carman, who was in it putting in a sack of po-tatoes, was thrown backward on some stones, and killed. The lad was held to be guilty of manslaughter.

So it was held that where one whips a horse on which another is riding so that it springs out, and runs over and kills a child, he is guilty of manslaughter: 2 Bish. Crim. Law, § 693. It is also manslaughter if, on a sudden quarrel between two persons, a blow intended for one of them ac-cidentally falls upon a third, whom it kills: *Rex v. Brown*, 1 Leach, 135; 1 East, P. C. 231, 245, 274.

Mr. Bishop says (2 Crim. Law, § 704):

"It appears to be a doctrine of the courts that, if parties become excited by words, and one of them attempts to chas-tise the other with a weapon not deadly, he will be held for manslaughter, though death is unintentionally inflicted."

And when a man discharges a gun at another's fowls, in mere wanton sport, he commits, if he accidentally kills a human being, the offense of manslaughter, while his intended act is only a civil trespass :   2 Bish. Crim. Law, § 692.

In State v. Roane, 2 Dev. (N. C.) 58, it was held the firing of a gun simply for the purpose of frightening another, by which shooting death is produced, is manslaughter.   In this case the prisoner's counsel requested the court to charge the jury " that if the defendant did not intend to kill, but only to frighten the deceased, they should find him not guilty of any offense," which was refused ; and the judge charged that if the defendant discharged his gun in a careless, negligent, and heedless manner, and thereby caused the death of the deceased, he was guilty of manslaughter, although he did not intend to kill.   Held no error.

And in People v. Fuller, 2 Parker, C. C. 16, it was held that where one carelessly discharged a gun into the street in the night-time, and shot deceased unintentionally, not knowing he was there, it was manslaughter.

. Mr. Bishop formulates the doctrine to be drawn from the adjudicated cases as follows (2 Crim Law, § 689):

" If an act is unlawful, or is such as duty does not demand, and of a tendency directly dangerous to life, however unintended, it will be murder.   But if the act, though dangerous, is not directly so, yet sufficiently dangerous to come under condemnation of the law, and death unintended results from it, the offense is manslaughter ; or if it is one of a nature to be lawful properly performed, and it is performed improperly, and death comes from it unexpectedly, the offense still is manslaughter."

Applying the principle to be deduced from the cases referred to, and the doctrine above laid down, to the case under consideration, and viewing the transaction in the light of the most favorable circumstances shown by the testimony, the act of respondent in killing the lad was manslaughter.   Indeed, there was no evidence upon which the requests of defendant's counsel could properly be based ; for it is impossible to separate the accidental shooting claimed from the other facts which give character to the act as negligent, heed-

less, and careless, in discharging a loaded pistol at such a time, in such a place, upon such an occasion. From his own testimony there could be no reasonable doubt in the minds of the jury that he was guilty of the crime of manslaughter; and when the case shows that there could be but one conclusion, and that in accordance with the verdict rendered, it will not be disturbed for a misdirection as to the meaning of the phrase "reasonable doubt": *People v. Marble*, 38 Mich. 125.

When the jury reported their verdict to the court they reported that they found the respondent guilty of voluntary manslaughter, which was reduced to form, and recorded by the clerk, who then said:

"Gentlemen of the jury, you say you find the respondent, Jacob Stubenvoll, guilty of manslaughter in manner and form as the people have in their information charged,—so say you, Mr. Foreman, so say you all?"

The jury answered:

"We do."

This was not error. We discover no error in the record, and the judgment is affirmed.

SHERWOOD, J., concurred.

CAMPBELL, C. J. (*dissenting*). The verdict in this case is a peculiar one, and can hardly have resulted from anything but gross misapprehension. There was no testimony in the record which could sustain a verdict of voluntary manslaughter, which involves intentional killing upon great provocation. If the killing here was intentional, I agree with my Brother CHAMPLIN that it would have been murder, but I do not think it could be made murder in the first degree. All this, however, is now unimportant, because, by the verdict rendered, respondent has been acquitted of murder.

I think there was testimony from which the jury could properly have found the respondent guilty of manslaughter. But the prisoner was himself a witness, and swore to what was an accidental discharge of his pistol, under circum-

stances which, if believed, made the result one of homicide by misfortune, and not punishable, unless civilly as an actionable injury from negligence.

The criminal law never was aimed at punishing as a crime that which involves no wrong purpose. Involuntary manslaughter, arising from wrong purpose not homicidal, does not exist unless death is caused in an attempt to carry out some unlawful purpose which is *malum in se*, but not felonious. If respondent purposely fired his pistol in the direction of the boy who was killed, the act was dangerous in itself, and might authorize a conviction. But merely firing a pistol is not an unlawful act, and firing in the air is not usually, and would not have been here, a dangerous act. It is laid down by Lord Hale that if a person (although not having the proper legal qualification, and therefore in violation of the statute) kills another accidentally while shooting at a bird, it is no crime, because his intent was no worse than if he had been lawfully qualified, and the act was a misadventure. 1 Hale, 475. Foster, in his concise treatise, takes the same view. Foster, 259. So far as I know, there is no respectable authority which upholds a conviction where the result is one of pure accident, with no serious mischief intended. Any other rule would be cruel and unreasonable.

If the prisoner was believed, the act was not one of his volition at all, but a merely accidental discharge. What he intended to do was an act legally innocent, had his intention been carried out. I think he had a right to go to the jury on this theory, and that the court erred in refusing his request to that effect. If he told the truth, he meant to fire in the air, with the foolish, but not wicked, design of frightening the boys. That is the utmost evil to which the accidental discharge of the pistol could be attached, if it could be to that. The jury might not believe his version, but he had a right to ask, as he did, a charge on the theory that it was true.

I think there should be a new trial.

MORSE, J., concurred.