PEOPLE *v.* AUSTIN.

1. HOMICIDE—MURDER—CLASSIFICATION BY STATUTE.
   3 Comp. Laws 1915, § 15192, providing that "All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, * * * shall be deemed murder in the first degree," does not attempt to define murder, but simply classifies a murder perpetrated in a particular manner as murder in the first degree, and has no application until a murder has been established.

2. SAME—MURDER—MANSLAUGHTER.
   Homicide is the killing of a human being by a human being, and may or may not be felonious; if felonious, it is either murder or manslaughter, dependent upon the facts and circumstances surrounding the killing.

On malice aforethought in definition for murder, see note in 38 L. R. A. (N. S.) 1054.

On homicide by poison or in perpetration of felony, see note in 21 A. L. R. 629.

3. SAME—MURDER DEFINED—POISONING—INTENT—IMPLICATION.

   To constitute murder, a killing must have been perpetrated with malice aforethought, either express or implied, and where death results from poison intentionally administered, the intent to kill will be implied.

4. SAME—POISONING—INTENT.

   Poison administered to aid in the perpetration of another crime, or in order to accomplish an unlawful act, although without intent to take life, is none the less murder; but where not so administered, and where death as a result is so remote a contingency that no reasonable person could have taken it into consideration when administering the poison, and could not have contemplated that death would result therefrom, the homicide is manslaughter only.

5. SAME—WILFUL POISONING WITH INTENT TO KILL—MURDER IN FIRST DEGREE.

   Murder by poison is included in the classification in the statute as murder in the first degree because it results from a wilful, deliberate, and premeditated act: administering poison with intent to kill.

6. SAME—POISONING—INTENT—INSTRUCTIONS.

   In a prosecution for murder by administering poison, where there was testimony from which the jury might have found the absence of such a felonious intent as is necessary to constitute murder, an instruction that they might convict of manslaughter should have been given.

7. CRIMINAL LAW—ADMISSIONS—EVIDENCE—ADMISSIBILITY.

   While statements made by one of two defendants not in the presence of the other are admissible, they should not be considered in determining the guilt of the one not present.

8. SAME—EVIDENCE—HEARSAY—INSTRUCTIONS.

   What the deceased had said to a witness who testified to statements made by one of the defendants was hearsay and should have been received only to the extent necessary to a full understanding of what was said by this defendant, and the jury should have been instructed that it was not substantive proof of the fact.

9. SAME—TRIAL—INSTRUCTIONS—REASONABLE DOUBT.

   It was not error for the trial court to refuse a requested

instruction that "It is a maxim of the law that 'It is better for ninety-nine guilty men to go unpunished than for one innocent person to suffer unjustly.' This is only another way of stating the law of reasonable doubt, which lies at the foundation of all criminal prosecutions," although counsel had a right to urge the jury to consider said proposition.

Error to Genesee; Brennan (Fred W.), J. Submitted January 12, 1923. (Docket No. 143.) Decided March 22, 1923.

Charles Austin and Clifford Thorpe were convicted of murder in the first degree and sentenced respectively to imprisonment for life in the State prisons at Marquette and Jackson. Reversed.

*Withey & Freeman*, for appellants.

*Andrew B. Dougherty*, Attorney General, and *Harry G. Gault*, Prosecuting Attorney, for the people.

SHARPE, J. The defendants, 19 and 16 years of age respectively, tried together, review their conviction of murder in the first degree on writ of error. It is clearly established by the proofs that Paul DeLisle died at his home in Flint on December 10, 1921, and that his death resulted from poison by carbolic acid taken by him in a drink of whisky. The defendants were arrested, charged with the crime, and, as the prosecution claims, on December 11th made a voluntary confession of their guilt. This confession was made to two police officers of the city, one of whom asked defendant Austin questions and wrote both the questions and his answers on a typewriter, after which they were signed and sworn to by Austin. Summarizing, Austin stated that he and Thorpe had been working for DeLisle occasionally prior to that time; that they had both stolen money

from DeLisle; that DeLisle had accused them of the theft and threatened to have them arrested; that on December 10th they went to DeLisle's home at his request; they found him sitting in a chair in his house considerably intoxicated; that they went out on the lawn and "agreed to get even with him;" that he, Austin, went to the barn (Thorpe watching) and got a bottle of poison off a shelf and they both went into the kitchen and mixed the poison with whisky and put the mixture in a green beer bottle and put it in a cupboard; that they poured out the balance of the poison, rinsed the bottle with hot water and with kerosene and put it back in the barn; that Thorpe then went into the room where DeLisle was and asked him if he did not want a drink; that DeLisle said he did and went into the kitchen and Thorpe showed him where the bottle was and DeLisle—

"took the bottle and placed it to his lips and drank about a cupful of it. He didn't say anything, but he made an awful face, and he walked into the next room, and sat down on a chair."

Austin was then asked:

"Q. How do you know it was poison?
"A. I touched it to my lips.
"Q. Did it burn?
"A. Yes, sir.
"Q. Did you think it was poison?
"A. Yes.
"Q. Then you and Clifford Thorpe intended to kill Paul DeLisle because he threatened to arrest you and Clifford for taking his money?
"A. Yes, sir."

He further stated that he and Thorpe found DeLisle about two hours after and that he was then dead. He was further asked:

"Q. Do you make this statement of your own free will without promise of reward or pardon?
"A. Yes, sir.

"*Q.* Have you been threatened in any way to make this statement?

"*A.* No, sir.

"*Q.* Were you in any fear when you made this statement?

"*A.* No, sir.

"*Q.* Is this statement the truth?

"*A.* Yes, sir."

Thorpe was present when Austin was interrogated. His statement was taken and sworn to in the same way. The questions asked Austin were not repeated to him but he said he had heard Austin's answers and that the facts as stated were true. He was, however, asked:

"*Q.* Then you and Charles Austin intended to kill Paul DeLisle because he threatened to arrest you and Charles Austin for taking his money?

"*A.* Yes, sir."

The next day, the defendants, in conversation with a newspaper reporter, denied the truth of the confessions made by them, saying they were forced to make them, but there was proof that on the following day the confessions were, in substance, again repeated in the presence of the officers and others. Both defendants were sworn as witnesses and testified that they were forced to make the confessions by threats and ill-treatment on the part of the officers. The assignments raise no question on the admissibility of these confessions. The weight to be given them was, of course, for the jury. The facts will be further stated in considering the errors relied on.

The trial court instructed the jury that they must convict the defendants of murder in the first degree or acquit them. Defendants' counsel insists that under the proofs the jury would have been justified in finding the defendants guilty of manslaughter. He preferred a request for such an instruction. Was there testimony to justify this request? Ivan Turner

and Maurice Wickham, two young boys, aged 17 and 16 respectively, witnesses for the prosecution, came to the yard after DeLisle had drunk the poisonous liquid. There was some talk about drinking moonshine whisky. Turner testified on direct-examination:

"Q. Did you see any bottles there?

"A. While talking to Thorpe and Austin, just the one they brought out. Clifford Thorpe brought out a bottle, a kind of a greenish colored bottle. It looked like this one here on the desk. The one marked Exhibit A. Thorpe brought that out. It was a little over half full.

"Q. Do you know what was in it?

"A. I could not say for sure. Moonshine whisky was in it. I put it to my lips, but that is all.

"Q. Why didn't you taste it?

"A. They started to make a fuss over it; one said it smelled like wood alcohol, the other carbolic acid, and I did not care to taste it.

"Q. Did it burn you?

"A. It stung a little but I don't know what you call burn. It stung a little on my lips. That bottle there (Exhibit A) looks like the bottle Thorpe handed to me.

"Q. Who else out there had a hold of that bottle while you were there?

"A. Charles Austin, Maurice Wickham, and Clifford Thorpe, and myself. Thorpe gave it to Austin when he first came out, Austin handed it to Maurice Wickham and Wickham handed it to me. Austin said it smelled of wood alcohol and Maurice Wickham said it smelled like carbolic acid. When we were through with the bottle, Clifford Thorpe took it back to the house and started carrying in his wood."

On cross-examination he said:

"Q. I want to ask you when it was that this green bottle was among you boys?

"A. It was just when I came home with the horse and I put him in the barn, I came out, and Maurice Wickham was kidding about getting a drink, and he

(Thorpe) brought out this bottle to us, in the yard. That was the time I saw the green bottle.

"*Q.* Why did Thorpe go into the house after that? What was said to him?

"*A.* Maurice Wickham asked him if he had anything to drink and he said he thought they had some and he went in the house and got this bottle and brought it out, a green colored bottle, which looks like Exhibit A, pop bottle size. He handed it to Austin and Austin to Wickham. Austin said it smelled like wood alcohol.

"*Q.* He didn't say anything about it having poison or anything?

"*A.* No, nor Clifford didn't. There was no warning to any of us boys there in the yard, by either Austin or Clifford, that the bottle contained poison. Nothing said about it at all. Some one gave it back to Clifford and he took it back into the house."

Wickham testified on direct-examination:

"I was out in the back yard when the green bottle was passed around. Clifford Thorpe brought it out; that was five or ten minutes before I left. Clifford handed it to Austin, Austin back to Thorpe. Thorpe gave it to me. I smelled of it. * * * The one that was handed to me, I should imagine, was about two-thirds full. It smelled like carbolic acid. * * * I was at the time familiar with the odor of carbolic acid. I don't remember whether I handed it back to Thorpe or gave it to Turner. Austin said he thought it was wood alcohol, I think. He took a taste of it and spit it out. * * *

"*Q.* Do you recall whether or not anything was said about them showing you: 'you could not drink moonshine whisky,' or something to that effect?

"*A.* I think it was.

"*Q.* Who said that and what was it?

"*A.* Clifford said it when he brought the bottle out in the woodshed. He was going to show us we could not drink moonshine. He said he was going to show us we could not drink moonshine, that was before I smelled of it."

On cross-examination he said:

221—Mich.—41.

"I have known Clifford quite a while; he and I and Austin were good friends.

"*Q.* When you were offered this bottle of drink by Clifford or Austin or either of them, did they give you any warning of the danger of it?

"*A.* No, sir, they were laughing then, they gave us no warning at all that it was dangerous to drink it. They said nothing about it being poison. Clifford said he would show me I could not drink moonshine bootleg whisky.

"*Q.* You say that he said Paul had just drank some of it?

"*A.* Yes, sir, he did when he went in the house.

"*Q.* You had not any reason to suppose that either one of these boys wanted to kill you?

"*A.* No, sir."

Roy Lawrence, a reporter for the Flint Daily Journal, was called to the police station about midnight, soon after the defendants had made the so-called second confession. He tells of an interview he had with the defendants as follows:

"I asked Thorpe if he had any knowledge of this carbolic acid bottle being in the barn, and he said he knew that there was a bottle in the barn, but that he did not know what it contained. * * * I questioned particularly about whether they knew what was in that bottle, and they said that they did not know, and I asked them what was the purpose of mixing this stuff and they said they intended to dope him.

"*Q.* Did they say why they wanted to dope him?

"*A.* No, not that I recollect."

Both defendants as witnesses denied that they had any knowledge that the bottle taken from the barn contained carbolic acid or that the liquid therein was poisonous. Thorpe testified that after DeLisle had drunk from the bottle he, Thorpe, said to Austin:

" 'If that man ain't crazy when he comes out, I don't know where I am going next.'

"*Q.* If that man ain't crazy when?

"*A.* When he comes out of his drunkenness."

Austin testified Thorpe said:

" 'If this does not make the old man crazy, I will not live,'—something like that."

The prosecution relies on the statute (3 Comp. Laws 1915, § 15192) :

"All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder of the first degree, and shall be punished by solitary confinement at hard labor in the State prison for life."

Attention is also called to the following language from the opinion in *People* v. *Hall,* 48 Mich. 482, 484 (42 Am. Rep. 477) :

"Murder by poison, under the statute, is always murder in the first degree, and the jury should have been so charged."

Reliance is also placed on *People* v. *Repke,* 103 Mich. 459, wherein this court held that when murder is committed and "there is no fact or circumstance that would reduce it below the first degree," the jury should be so instructed.

"Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the State, with malice prepense or aforethought, either express or implied."  Tiffany's Criminal Law (How. 4th Ed.), p. 952.

"Manslaughter is the unlawful and felonious killing of another without malice, either express or implied." *Id.* 972.

In 13 R. C. L. p. 784, involuntary manslaughter is defined as follows:

"The crime is defined by the common law as the killing by one person of another person, in doing some unlawful act not amounting to a felony, nor likely to

endanger life, and without an intention to kill; or where one kills another while doing a lawful act in an unlawful manner."

Neither murder nor manslaughter is defined in our statutes. The section above quoted simply classifies a murder perpetrated in a particular manner as murder in the first degree. It has no application until a murder has been established. Then, if the proofs show that it was perpetrated by means of poison, lying in wait, etc., the jury should be instructed that it is deemed murder in the first degree. Homicide is the killing of a human being by a human being. It may, or may not, be felonious. If felonious, it is either murder or manslaughter, dependent upon the facts and circumstances surrounding the killing. To constitute murder, the killing must have been perpetrated with malice aforethought, either express or implied. The intent to kill will be implied when death results from poison intentionally administered. If it appears that the poison was not administered with intent to take life, but to aid in the perpetration of another crime, or in order to accomplish an unlawful act, it is no less murder. But where it is not so administered, and where death as a result is so remote a contingency that no reasonable person could have taken it into consideration when administering the poison and could not have contemplated that death would result therefrom, the homicide is manslaughter only. The statute classifies all murders perpetrated "by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing" as murder in the first degree. Murder by poison is so included because it results from a wilful, deliberate and premeditated act. Administering poison with intent to kill is necessarily so. That the intent with which the poisonous substance is administered is material to the issue presented on such a charge was clearly recog-

nized in *People* v. *Thacker*, 108 Mich. 652, and *People* v. *MacGregor*, 178 Mich. 436. In each of these cases this court held that the prosecution might show that the defendant, about the same time, was giving poison to another inmate of the household, as bearing upon the intent with which it was administered to the deceased person. The reasoning in *Wellar* v. *People*, 30 Mich. 16, and in *People* v. *Droste*, 160 Mich. 66, is instructive on the general rule that where there is testimony from which the jury might find the absence of such a felonious intent as is necessary to constitute murder, an instruction that they might convict of manslaughter should be given. On the record here presented, the jury should have been so instructed.

The other errors relied on are not likely to arise on a new trial. No legal questions are presented on which counsel seriously disagree. Statements made by one of the defendants, though not in the presence of the other, are admissible. Of course, the jury should be instructed that they should not be considered in determining the guilt of the one not present. The rules governing such statements are clearly stated in *People* v. *O'Brien*, 68 Mich. 468. What the deceased had said to the witness Rosenberger, who testified to statements made by Austin, was hearsay and should have been received only to the extent necessary to a full understanding of what was said by this defendant, and the jury should have been instructed that it was not substantive proof of the fact. *People* v. *Foley*, 64 Mich. 148.

Defendants' counsel's 17th request reads:

"It is a maxim of the law, that 'It is better for ninety-nine guilty men to go unpunished than for one innocent person to suffer unjustly.'

"This is only another way of stating the law of reasonable doubt, which lies at the foundation of all criminal prosecutions."

While counsel had a right to urge the jury to con-

sider the proposition stated, our attention is not called to any authority making it obligatory upon a court to state it as a rule of law to the jury.

The judgment of the court is set aside and a new trial granted. The defendants will be returned to the custody of the sheriff of Genesee county to await such trial.

WIEST, C. J., and FELLOWS, MCDONALD, BIRD, MOORE, and STEERE, JJ., concurred. CLARK, J., did not sit.