PEOPLE v PAWLAK

Docket No. 55580. Submitted April 12, 1982, at Detroit.—Decided
October 19, 1982. Leave to appeal applied for.

John Pawlak was convicted of involuntary manslaughter, Detroit
Recorder's Court, James E. Roberts, J. The defendant was
employed as a police officer for the City of Detroit. The charge
against the defendant arose out of the death of an alcoholic
prisoner whom the defendant had struck with a blackjack after
placing the prisoner in a cell in a Detroit Police Department
lock-up. The prisoner's liver and spleen were so enlarged that
they were in contact and the sudden impact of the blackjack
caused the prisoner's spleen to rupture against his hardened
liver resulting in his death. The defendant appeals alleging
that the information charging him with committing man-
slaughter by an unlawful act not naturally tending to cause
death or great bodily harm failed to state a crime and that the
trial court's verdict was based upon an erroneous standard that
deprived him, as a police officer, of his lawful discretion to use
reasonable force. *Held:*

1. The information filed against the defendant did comply
with the definition of involuntary manslaughter as defined by
the Michigan Supreme Court; involuntary manslaughter does
not require intent or foreseeability of harm. The principle that
criminal liability must reflect a culpable mental state is not
violated by that definition of involuntary manslaughter. The
evidence at the trial was sufficient to support the conviction of
involuntary manslaughter.

2. A police officer has the right in making an arrest to use
that force reasonable under the circumstances. Here, however,
the victim was already arrested, had been placed in a holding
cell, and, presumably, was without means of escape. The severe
force that was apparently utilized by the defendant was unjust-
ified. Even if the incident had occurred during the decedent's
arrest, a question of fact nevertheless would have existed as to

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 40 Am Jur 2d, Homicide §§ 54, 70.
[2, 3] 4 Am Jur 2d, Appeal and Error §§ 159 *et seq.*, 523.
   5 Am Jur 2d, Appeal and Error § 882.

whether the force used was reasonable under the circumstances.

Affirmed.

V. J. BRENNAN, J., dissented. He believed that there was insufficient evidence to support the defendant's conviction of involuntary manslaughter. He believed that the defendant was lawfully performing the responsibilities of his job as a lock-up doorman at the jail. The evidence established that there was only one blow struck with the blackjack, which was to the deceased's side and not to his head or other parts of his body. No beating took place and there were no repeated blows. The defendant was not aware of the deceased's liver and spleen problem. He would reverse the defendant's conviction.

### OPINION OF THE COURT

1. HOMICIDE — INVOLUNTARY MANSLAUGHTER.

Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty; involuntary manslaughter does not require intent or foreseeability of harm (MCL 750.321; MSA 28.553).

2. CRIMINAL LAW — APPEAL — EVIDENCE.

A reviewing court, in determining whether sufficient evidence was presented to support a conviction, must view the evidence in a light most favorable to the prosecution and where the record reveals that a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt the conviction should be upheld.

### DISSENT BY V. J. BRENNAN, J.

3. CRIMINAL LAW — APPEAL — EVIDENCE.

*A reviewing court, in determining whether sufficient evidence was presented to support a conviction, must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.*

4. HOMICIDE — INVOLUNTARY MANSLAUGHTER.

*Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or*

*great bodily harm, or in negligently doing some act lawful in*
*itself, or by the negligent omission to perform a legal duty; the*
*usual situations in which involuntary manslaughter arises are*
*either when death results from a direct act not intended to*
*produce serious bodily harm or when death results from crimi-*
*nal negligence.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Frank J. Bernacki,* Assistant Prosecuting Attorney, for the people.

*Ramsdell, Oade & Feldman* (by *K. Preston Oade, Jr.),* for defendant on appeal.

Before: N. J. KAUFMAN, P.J., and V. J. BRENNAN and BEASLEY, JJ.

PER CURIAM. Defendant was convicted in a bench trial of involuntary manslaughter, MCL 750.321; MSA 28.553, and was subsequently sentenced to five years probation, with the first nine months to be spent in the Wayne County Jail on a work-release program. Defendant now appeals as of right.

The charge against defendant arose out of the February 3, 1980, death of Fred Warren, a prisoner at the Detroit Police Department Second Precinct lock-up where defendant was employed. Warren died as a result of being struck with a blackjack on the left side by defendant. The blow was the culmination of an argument between Warren and defendant, an argument that defendant claimed was the result of Warren's refusal to turn over his belt to defendant upon being placed in a cell. Warren apparently was a severe alcoholic whose liver and spleen were so enlarged that they were in contact. The sudden impact of the black-

jack caused Warren's spleen to rupture against his hardened liver, resulting in substantial internal bleeding.

Defendant raises two issues on appeal. First, that the information charging manslaughter by an unlawful act not naturally tending to cause death or great bodily harm failed to state a crime. Second, that the trial court's verdict was based upon an erroneous standard that deprived defendant, as a police officer, of his lawful discretion to use reasonable force.

In his first argument, defendant contends that the crime of involuntary manslaughter cannot exist unless the act committed was inherently dangerous so that the resulting death was foreseeable. The Supreme Court has defined the crime of involuntary manslaughter as one not requiring intent or foreseeability of harm. *People v Townes,* 391 Mich 578, 591; 218 NW2d 136 (1974). The information charging defendant was consistent with this definition, alleging that defendant killed Warren "unintentionally and without malice, by doing an unlawful act, to wit: assaulting [Warren] with a slapjack or blackjack, an act not naturally tending to cause death or great bodily harm". We do not believe that the principle that criminal liability must reflect a culpable mental state is violated by the *Townes* definition of involuntary manslaughter. *Cf. People v Aaron,* 409 Mich 672, 708; 299 NW2d 304 (1980).

In his second argument, defendant misapplies the doctrine that a police officer has the right in making an arrest to use that force reasonable under the circumstances. *People v Doss,* 406 Mich 90, 101-103; 276 NW2d 9 (1979). The events that resulted in Fred Warren's death did not involve his arrest. Mr. Warren was already arrested, had

been placed in a holding cell and, presumably, was without means of escape. Under these circumstances, the severe force that was apparently utilized by defendant was unjustified. Indeed, a police department memorandum applicable to persons already arrested and imprisoned mandates that no measure of severity is justified when there is no reason to fear the prisoner's escape. Further, even if the incident had occurred during the decedent's arrest, a question of fact nevertheless would have existed as to whether the force used was reasonable under the circumstances.

Defendant does not specifically argue that the evidence at trial was insufficient to support his conviction. Nevertheless, because defendant has alluded to such a claim in his first argument, we agree with the dissenting opinion that such an argument bears addressing. In determining the sufficiency of the evidence supporting a conviction, we view the trial evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979); *People v Johnson,* 112 Mich App 483, 489; 316 NW2d 247 (1982); *People v Delongchamps,* 103 Mich App 151, 159; 302 NW2d 626 (1981). Involuntary manslaughter has been defined as "the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty". *People v Townes,* 391 Mich 578, 590; 218 NW2d 136 (1974); quoting *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923). We believe that when the evidence

adduced at trial is viewed in a light most favorable
to the prosecution, it is more than sufficient to
allow a rational trier of fact to find beyond a
reasonable doubt that defendant killed Fred War-
ren in the commission of an unlawful act.

Three prisoners in the Second Precinct lock-up
were eyewitnesses to the alleged assault. Timothy
Washington testified that he was processed by
defendant at the same time that Warren was
processed. He indicated that Warren and defen-
dant argued about some medicine that was taken
from Warren and over whether Warren was a
"junkie". According to Washington, the arguing
continued after defendant had placed Warren
within a cell. He stated that defendant reopened
the cell door, stepped inside and spit at Warren.
When Warren spit back, defendant took out his
blackjack, ran toward the retreating Warren and
struck him on the left side with the blackjack.
Washington also stated that defendant kicked
Warren around the knee and told him, "If he said
anything else he would crack his skull". Washing-
ton indicated that Warren slid down the wall after
being struck. He also testified that while Warren
was belligerent and ready to fight, he threw no
punches.

Chuckie Williams, who was in the cell adjacent
to Warren's cell, testified that defendant and War-
ren were "passing words" as Warren was led to
the cell. Williams stated that defendant taunted
Warren after locking him in the cell, and then
reopened the cell door and spit at Warren. Wil-
liams testified that he saw defendant pull out a
blackjack, raise it over his shoulder and run into
the cell. Williams lost sight of defendant but heard
a hitting sound and then something hitting the
wall. Williams stated that he heard defendant

warn Warren that if he moved defendant would
split his skull.

Claude Langston, who was in a cell diagonally
across from Warren, testified that Warren stag-
gered and spoke profanely to defendant as he was
placed in the cell. Langston indicated that defen-
dant stood outside the cell listening to Warren
curse at him when Warren spit at defendant.
Defendant spit back as he re-entered the cell and
drew out his blackjack. Langston stated that de-
fendant cornered Warren and that Warren at-
tempted unsuccessfully to throw punches. Accord-
ing to Langston, defendant hit Warren once with
the blackjack and then kicked him in the stomach.

Defendant testified on his own behalf. He stated
that he suspected Warren of ingesting drugs in a
bathroom and that the two exchanged words as
Warren was registered. Defendant claimed that
after he closed the cell door, he noticed that War-
ren still had his belt. When he requested the item,
Warren refused and cursed him. He testified that
when Warren spit at him, he spit back and en-
tered the cell to retrieve the belt. Defendant con-
tended that Warren began to throw punches, so he
struck Warren once in the side with his blackjack.
He stated that he then grabbed the belt and left
the cell.

A glaring difference between the testimony of
the defendant and that of the three witnesses to
the incident is that none of the prisoners observed
a dispute over Mr. Warren's belt. Each of those
witnesses indicated that the blow from the black-
jack was the culmination of an argument and
spitting contest between defendant and Warren
that had begun before Warren was even placed in
the cell. Viewing the evidence in a light most
favorable to the prosecution, a rational trier of

fact could have concluded that defendant re-entered the cell not to retrieve Warren's belt but because he was angry at Warren and wanted to physically retaliate for Warren's cursing and spitting. A rational trier of fact could have thus viewed defendant's conduct as a felonious assault or an assault with intent to do great bodily harm. Moreover, even if a trier of fact accepted as true, as the trial court did, defendant's claim that he re-entered the cell to retrieve Warren's belt, a guilty verdict could nevertheless be supported. As the trial court observed, it should have been plainly evident from the arguing that preceded the entry into the cell that Warren was not going to be cooperative and that force would be necessary to remove his belt. Thus, although defendant had a responsibility to retrieve the item, it is manifest that the task should have been accomplished with the aid of other officers to avoid the need to use severe force. As noted above, police department policy prohibited measures of severity absent a reason to fear the prisoner's escape. A rational trier of fact could have concluded that defendant had no justification for using the force that he did, and, therefore, committed an unlawful act—at minimum a simple assault and battery—in doing so. Pursuant to the Supreme Court's definition of involuntary manslaughter in *People v Townes, supra,* the offense could have been deemed proven beyond a reasonable doubt. For these reasons, we affirm defendant's conviction and sentence.

Affirmed.

V. J. Brennan, J. *(dissenting).* I respectfully dissent. After careful consideration and evaluation of the evidence, I find that there was insufficient evidence to support defendant's conviction of involuntary manslaughter.

When determining whether there is sufficient evidence to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979); *People v Johnson,* 112 Mich App 483, 489; 316 NW2d 247 (1982).

In *People v Townes,* 391 Mich 578, 590-591; 218 NW2d 136 (1974), the Court discussed the crime of involuntary manslaughter:

"The elements of involuntary manslaughter, although not completely exclusive of those found in voluntary manslaughter are distinguishable in several respects. They define a crime that originates out of circumstances often quite different from those found in voluntary manslaughter and apply to a defendant who did not proceed with the intent to cause death or serious bodily injury. In the leading case of *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923), the Court approved the following definition of involuntary manslaughter:

" 'Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty.'[4]

"The usual situations in which involuntary manslaughter arise are either when death results from a direct act not intended to produce serious bodily harm, *People v Carter,* 387 Mich 397, 419; 197 NW2d 57 (1972), *People v Austin,* 221 Mich 635, 643-645; 192 NW 590 (1923), or when death results from criminal negligence. *People v Stubenvoll,* 62 Mich 329; 28 NW 883 (1886); *People v Townsend,* 214 Mich 267; 183 NW 177; 16 ALR 902 (1921)."

---

"[4] The negligence required to establish involuntary manslaughter

is different in kind from ordinary negligence. Such negligence is variously referred to as 'criminal negligence' or 'gross negligence' and has been discussed thoroughly in several cases. See for example, *People v Orr,* 243 Mich 300; 220 NW 777 (1928); *People v Townsend,* 214 Mich 267; 183 NW 177; 16 ALR 902 (1921)."

Defendant was a Detroit police officer working as a lock-up doorman on the 11 p.m. to 8 a.m. shift on February 2 and 3, 1980. Fred Warren, also known as Edgar Smith, was brought to the lock-up at approximately 1:30 a.m. on February 3, 1980, following his arrest. Defendant processed Warren and another prisoner. During processing, defendant and Warren argued. After shutting Warren into a cell, a spitting incident occurred between the defendant and Warren, as well as more arguing. Defendant testified that he noticed a belt on Warren's coat and requested that Warren give him the belt. When Warren refused, the defendant went into the cell. Warren, who was 6' 3" tall and weighed 228 pounds, began throwing punches at the defendant, who was 6' 1" tall and weighed 225 pounds, as the defendant approached him. Defendant warded off the punches and hit Warren *once* with a blackjack on the left side. The defendant took the belt and then left the cell. At 6:30 a.m., two officers checked on Warren and radioed for an EMS unit. Warren had a very distended abdomen, no vital signs, and signs of rigor mortis. Warren's body was taken to the morgue. A medical examiner testified that Warren had cirrhosis of the liver which caused the liver to become enlarged and hardened. Warren's spleen was also enlarged and in contact with the liver, unlike a normal, healthy adult's liver and spleen. The cause of death was a trauma to Warren's left side causing the spleen to rupture on contact with the hardened liver. Due to the deceased's alcoholic disabili-

ties, a hard blow was not necessary for this chain of events to occur.

The trial court found that the defendant was not acting in self-defense. Further, the court found that because there was no fear of escape, no measure of force was justified, and the defendant committed an assault on the deceased. The court stated:

"The idea of carrying a night stick or using a night stick, blackjack, to acquire a belt from a prisoner for purposes of forcefully acquiring this belt which is believed might be used by the prisoner to injure himself, it seems a poor exercise of discretion because it's like doing to the prisoner what one fears he might do to himself.

"Now, if there had been—and there was no testimony to this, that there was any noticeable indications of severe depression or any other conditions that would warrant immediate interference in this matter.

"The court wonders why, one, he wasn't just left alone. Defendant testified that he was—he noticed that he had been drinking, strong odor of alcohol on his breath when he admitted him. I think it can be fairly well assumed that he might fall asleep; just leave him alone.

"The language of the prisoner, if we are to accept the testimony of the defendant, when he hurled the expletives at him when he asked for the belt, indicated—at least his feeling when he went in—he wasn't going to be cooperative. Since he was behind locked doors, why not get another officer to help so that the belt could, if it must be, could be acquired without resorting to violence? It would have seemed to me that a second party may have—might well have rendered violence unnecessary."

I cannot agree with the trial court's conclusion that the defendant intended to injure the deceased, nor can I agree with the trial court's

conclusion that, considering the deceased's uncooperative attitude, the defendant should not have attempted to retrieve the belt because there was no testimony that the deceased was severely depressed and it could be assumed that the deceased would fall asleep.

The defendant, a police officer, was lawfully performing the responsibilities of his job as a lockup doorman at the jail. Although the three prisoner eyewitnesses made no mention of the defendant's contention that he entered the cell to retrieve the decedent's belt, the trial court believed the defendant's testimony that he did enter the cell for the purpose of obtaining the belt. Further, even though the testimony did not reveal that the deceased was suicidal, the defendant had an obligation to retrieve any article that could be used in a suicide attempt. A belt is a common article used for suicide. If a prisoner committed suicide, the officer in charge could very well be accused of negligence in not removing all objects or articles that could be used in a suicide and civil liabilities might attach. See *Young v Ann Arbor,* 119 Mich App 512; 326 NW2d 547 (1982), where a police officer was sued by a plaintiff after her husband committed suicide by hanging himself with his belt while held in a detention cell at the police station. Also, see Michigan Department of Corrections Rule 791.632. As pointed out in the defendant's brief:

"Indeed, this court may take judicial notice of the number of prisoners who have committed suicide in Michigan jails by the use of belts or similar articles. With the first six months of the same year as the offense charged here against the defendant, 11 people committed suicide in Michigan jails. Of these, seven were alcohol-related and two were drug-related. More-

over, since 1976, alcohol has been a factor in fully one-third of the suicides occurring in jails and lock-ups; and a majority of these occurred in the Wayne County area. Michigan Police Officer, vol 8 (December, 1980)."

In addition, the evidence revealed that the defendant and the deceased were approximately equal in size. Contacts between the two during the time the defendant processed the deceased indicated that the deceased was not going to be cooperative. Therefore, the defendant was on notice that the deceased would not give up the belt voluntarily but that the defendant would have to take it forcibly from him. The fact that the defendant chose to retrieve the belt himself, instead of obtaining the assistance of other police officers, does not indicate that the defendant intended to inflict any type of injury on the deceased.

Also, it is not unreasonable for a police officer to carry a blackjack. This fact does not indicate that the officer intended to do an unlawful act, and in this instance the manner and use of the blackjack was not an unlawful act. The blackjack is a protective instrument that jailers and police have to use to repel possible assault. Here the defendant had all the reason to believe that this might occur. We must remember that the atmosphere around a jailhouse, especially when unruly prisoners are there, is not akin to a church bazaar. Different and distinct modes of conduct and duties must be put into motion to maintain and convey a clear picture or impression as to who is in charge; if not, there would be chaos.

Moreover, the evidence established and the trial court found that there was only one blow struck which was to the deceased's side and not to his head or other parts of his body. No beating took place; there were no repeated blows. Further, the

officer clearly was not aware of the deceased's liver and spleen problem. From these facts, I cannot find that the defendant intended to inflict any injury or commit an unlawful act.

This opinion does not condone the use of force by police officers when dealing with prisoners, and I note that each case must be decided on its own facts. However, under the facts of this case, I find that where the police officer had a lawful duty to retrieve the prisoner's belt and had to use some force to retrieve the belt, the elements of involuntary manslaughter were not present. Therefore, I would reverse the defendant's conviction.

Resolution of the foregoing issue being dispositive, I find it unnecessary to discuss defendant's remaining allegations of error.