*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DEANDRE TERREL AUSTIN,

Defendant-Appellant.

UNPUBLISHED
January 14, 2020

No. 344703
Wayne Circuit Court
LC No. 17-010362-01-FC

Before: K. F. KELLY, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM.

Defendant Deandre Terrel Austin appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), three counts of armed robbery, MCL 750.529, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life in prison for the felony-murder conviction, and concurrent prison terms of 1 to 15 years for each armed robbery conviction and time served for the felon-in-possession conviction, to be served consecutively to a two-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. UNDERLYING FACTS

Defendant's convictions arise from the fatal shooting of a limousine driver, Devin Lowe, and the robbery of Lowe's three patrons following a concert in Detroit. On April 14, 2017, three young men from Toledo, Ohio—Jameson Sheely, Scott Zaborowski, and Thomas Stover (collectively "the three friends")—went to Detroit to attend a concert at the Fox Theater. They traveled from Toledo to Detroit in a limousine ("limo") rented for them by Sheely's father. The three friends were drinking champagne and vodka in the limo and two of them were also smoking marijuana. After the concert, which ended around midnight, the three friends could not immediately locate the limo. After several phone calls and a visit to a nearby bar for some drinks, the three friends found the limo parked across the street from the Fox Theater.

Sheely acknowledged that he was intoxicated at this point. Lowe asked the group if they wanted to go to another bar, the Delux Lounge near Greektown, and the friends agreed. They drank some more and danced at the Delux. Lowe went into the bar as well. They stayed at the

Delux until 2:00 or 3:00 a.m., when they left with two African-American men who they met at the Delux Lounge. Surveillance videos from the Delux Lounge and nearby locations showed the three friends, Lowe, and the two other men get into the limo after leaving the Delux. One of the other two men, who was wearing a Chicago Bears starter jacket, was identified as Donta Etchen. The other man was wearing a black jacket. Etchen identified defendant, whom Etchen had known for some time, as the man wearing the black jacket. Lowe told the three friends that he intended to drop the other two men off at a gas station.

As the limo pulled away from the Delux, an argument began that first involved Lowe and Etchen and later included the man in the black jacket. The argument concerned drugs, and Lowe was complaining about the quality of some cocaine. The three friends, who were still drinking as Lowe drove to the gas station, tried to end the argument, telling Lowe that they would reimburse him and he did not have to worry about losing money. After they arrived at the gas station, Lowe got out of the driver's seat and moved into the rear passenger seat. Lowe and the other two men began discussing a "trade" or refund involving cocaine that Lowe had purchased. Lowe returned to the front seat, and then Etchen and Stover got out of the limo and went inside the convenience store at the gas station. When they returned, Lowe was sitting in the middle of the back seat. Stover got back into his seat, and Etchen stood by the side door.

Sheely testified that he heard a loud pop, and then heard more pops, about seven in all. He did not immediately know what was going on. Sheely then saw that the man in the black jacket had a gun, which he pointed at Sheely's forehead, and said, "Give me your sh*t, motherf**ker." Sheely gave the man in black his watch, and the man ripped off his necklace and bracelet. The man in the black jacket also pointed the gun at the other two friends and took jewelry from Stover but refused to take Zaborowski's watch. After the shooter left, the three friends ran inside the gas station and called the police. According to Sheely, no one other than the man with the black jacket had a gun that night. Sheely denied hearing Lowe threaten the shooter before Lowe was shot. After the shooting, Sheely was shown a photographic lineup and identified another person as the shooter. At trial, Sheely testified that he did not see anyone in the courtroom who had been in the limo on the night of the shooting.[1]

Several items recovered from inside the limo were tested for DNA and compared to reference DNA swabs from Sheely, Stover, Zaborowski, Etchen, Lowe, and defendant, as well as Jovan McDade, who had been identified as another possible suspect. None of the DNA profiles developed from evidence collected from the crime scene matched either Etchen or McDade. A cigarette butt had a DNA profile that originated from three donors. There was a strong probability that Sheely and defendant were two of the contributors, and the third was not identified.

---

[1] Zaborowski and Stover testified similarly to Sheely that the shooting was precipitated by a dispute over money and drugs. However, Zaborowski identified defendant in court as the shooter. Etchen testified that he knew defendant merely as "Black," but identified his photograph as the shooter.

Detective Andrew Guntzviller, the officer-in-charge, testified that surveillance video from the night of the shooting was distributed to news outlets, and the public was invited to call in with any information about a suspect. The police received a tip identifying Jovan McDade as a potential suspect in the case. According to Guntzviller, McDade did bear some physical resemblance to defendant, the individual identified as "Black" in the surveillance videos, but further investigation failed to link McDade to the crimes. After the police learned that defendant was a match for DNA found in the limo, his photo was included in a lineup that was shown to Etchen, who identified defendant as the individual he knew as "Black." Defendant was arrested in Georgia and extradited back to Michigan.

The jury convicted defendant as charged of first-degree felony murder, three counts of armed robbery, and the firearm offenses. This appeal followed.

## II. REASONABLE-DOUBT JURY INSTRUCTIONS

Defendant first argues that the trial court erred by using hypothetical examples from real life to explain the concept of "reasonable doubt" to the jury. Defendant argues that the court's examples "demeaned the reasonable-doubt standard," were "glib and unbefitting," and denied him a fair trial.

Because defendant did not object to any of the examples at trial, this issue is unpreserved. *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011). Therefore, we review this issue for plain error affecting defendant's substantial rights. *People v Allen*, 466 Mich 86, 89-90; 643 NW2d 227 (2002). The plain error standard requires a defendant to establish "(1) that the error occurred, (2) that the error was 'plain,' (3) that the error affected substantial rights, and (4) that the error either resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Vaughn*, 491 Mich 642, 654; 821 NW2d 288 (2012); see also *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

"A defendant has the right to have a properly instructed jury consider the evidence against him or her, and it is the trial court's role to clearly present the case to the jury and to instruct on the applicable law." *People v Henderson*, 306 Mich App 1, 4; 854 NW2d 234 (2014) (quotation marks and citation omitted). Included within the right of a criminal defendant to a jury trial is the requirement that the prosecution prove guilt beyond a reasonable doubt. *Allen*, 466 Mich at 91. An erroneous definition of reasonable doubt has been held to constitute a structural error in the trial. *Id.*, citing *Sullivan v Louisiana*, 508 US 275, 279; 113 S Ct 2078; 124 L Ed 2d 182 (1993). "[T]he defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Weaver v Massachusetts*, ___ US ___, ___; 137 S Ct 1899, 1907; 198 L Ed 2d 420 (2017) (quotation marks and citation omitted). "A structural error necessarily renders unfair or unreliable the determination of guilt or innocence and defies harmless error analysis." *Allen*, 466 Mich at 90. However, " 'reasonable doubt' is not an arcane phrase beyond the comprehension of jurors." *Id.* at 91. " 'Jurors are presumed to have common sense, and to understand common English.' " *Id.*, quoting *Hamilton v People*, 29 Mich 173, 194 (1874).

"Language that is within the comprehension of persons of ordinary intelligence can seldom be made plainer by further definition or refining. All persons who possess the qualifications of jurors know that a 'doubt' is a fluctuation or uncertainty of mind arising from defect of knowledge or of evidence, and that a doubt of the guilt of the accused, *honestly entertained*, is a 'reasonable doubt.' " [*Allen*, 466 Mich at 91, quoting *People v Steubenvoll*, 62 Mich 329, 334; 28 NW 883 (1886) (emphasis in *Steubenvoll*).]

The United States Supreme Court has held that "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v Nebraska*, 511 US 1, 5; 114 S Ct 1239; 127 L Ed 2d 583 (1994). However, "[i]f a trial court gives a deficient definition of reasonable doubt, it cannot be presumed that the jury has, in fact, found guilt beyond a reasonable doubt[.]" *Allen*, 466 Mich at 91. "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor*, 511 US at 5. "Rather, 'taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury.' " *Id.*, quoting *Holland v United States,* 348 US 121, 140; 75 S Ct 127; 99 L Ed 150 (1954) (alteration in *Victor*).

In the present case, at the beginning of jury voir dire, and before any jurors were seated, the trial court read the information on the charges against defendant and read the model jury instruction regarding the presumption of innocence, burden of proof, and reasonable doubt, M Crim JI 1.9, verbatim. After the court began voir dire with the first seated potential jurors, the court explained the function of the court, the prosecution, and the defense. The court explained the prosecution's duty to prove each and every element of a charge beyond a reasonable doubt using an analogy to a cake mix recipe that required the use of oil, water, and egg. The court explained that without all of these ingredients, you could not make the cake. Similarly, if the prosecutor did not prove each element of a charged offense beyond a reasonable doubt, the jury must acquit the defendant of that charge. The court continued by giving examples of direct and circumstantial evidence and explaining the jury's role as the trier of fact in determining the credibility of the witnesses and factors for the jury to consider in evaluating credibility. The court emphasized that there was nothing "magical" about the witness chair, and in evaluating the testimony of witnesses the jurors had to use their "reason and common sense" to assess if a person was being truthful as "we do every day in the community." The court explained that the jurors had to listen to the facts "to determine whether or not the People have proven each and every element, beyond a reasonable doubt."

The court continued by explaining the difference between any doubt and reasonable doubt by using a hypothetical about a casino patron withdrawing cash from an ATM who feels a metal object at the back of his head. The court asked a potential juror what he would infer the person with the metal object wanted. The juror replied that the person wanted the patron's money. The court remarked that it was possible the person holding the metal object was writing a dissertation and was only doing research to study responses to perceived fearful events, but this was not a reasonable assumption. The court followed with another hypothetical question regarding a juror's 11-year-old daughter who came into the house crying and asked whether the juror could infer that her child was sad. The court explained: "The law says that you can infer,

from a person's actions, their state of mind. We're not looking for absolute certainty. But the— the standard of proof is beyond a reasonable doubt. Not any doubt, not a shadow of a doubt, but beyond a reasonable doubt, okay?"

Continuing, the court stated that it did not matter if one side called 19 witnesses and the other side called none. "Because we know the prosecution has the burden of proof, okay? Your job is to determine whether or not, based on the evidence that's presented, the People have proved each and every element, beyond a reasonable doubt." The court again referred to the standard jury instruction on reasonable doubt, stating:

> A reasonable doubt is a fair—a reasonable doubt is a fair and honest doubt, growing out of the evidence or lack of evidence. And, you know what that is, what evidence is. It's not merely an imaginary, or a possible doubt, but a doubt based on reason and common sense. There goes that word, again—those words. A reasonable doubt is just that: a doubt that is reasonable, after a careful and considered examination of the facts and circumstances of the case—of this case.

The court next presented a lengthy hypothetical, challenged by defendant on appeal, about an engaged woman planning her wedding. After describing the type of wedding the woman wanted, how she watched the bridal station on television, and how she proposed to save money by making placemats and sewing the lace on her wedding gown herself, the court related a scenario whereby the woman received a call from her fiancé who said he needed to cancel their dinner plans because he had to pick up a friend at the airport. As the engaged woman was driving around doing errands, she saw her fiancé and another woman walking into a hotel. She called her fiancé, and his phone went straight to voicemail. The engaged woman waited about two hours, until her fiancé exited the hotel with the other woman, and they hugged and got into his car. When the engaged woman called her fiancé the next day, she asked about his evening and he said it was wonderful, he had dinner with the friend he picked up at the airport, and he told his friend "how blessed and honored" he was to be marrying her. The trial court asked a potential juror if there was a reason, based on these facts, for the engaged woman to doubt that her fiancé was being truthful. The juror agreed and articulated the facts of the hypothetical. The court asked the juror how long it took to reach that conclusion in his mind and the juror indicated that it took minutes. Other jurors responded that it took seconds. The court then reiterated the standard jury instruction on reasonable doubt, stating: "A reasonable doubt is a fair and honest doubt, growing out of the evidence or lack of evidence. It's not merely an imaginary, or a possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that: a doubt that is reasonable, after a careful and considered examination of the facts and circumstances of this case." The court added, "It don't take long."

The court concluded its discussion about the weighing process with the following remarks about calling a friend, which defendant also particularly challenges on appeal:

> That's what we're talking' about. We do this all the time. We'll call somebody: 'You got a minute? Girl, let me tell you what happened, today,' da, da, da, da, da, da, da. 'What you think?' We're asking someone's opinion, who we're giving the facts and circumstances, to use their reason and common sense to

come up with a decision about whether or not that person is being truthful, or not. That's all we're asking you to do. It's simple. That's the burden of proof, okay?

After the jury was selected and sworn, the court again repeated, verbatim, the standard instructions, including M Crim JI 1.9, regarding the presumption of innocence, burden of proof, and reasonable doubt. After the evidence was heard and both parties rested, the court again read the M Crim JI 1.9, regarding the presumption of innocence, burden of proof, and reasonable doubt.

We are not persuaded that the trial court plainly erred by instructing the jury on reasonable doubt. Although there were perhaps some unconventional elements in the trial court's explanations of the concept, the trial court recited the model criminal jury instruction regarding reasonable doubt multiple times. Defendant does not challenge that instruction as erroneous. Given the court's repeated recitation of M Crim JI 1.9, which accurately conveyed the concept of reasonable doubt, no structural error affecting the trial's fundamental framework occurred. Further, defendant does not identify any statements in the court's attempts to illustrate the concept of reasonable doubt that we perceive as plainly erroneous and "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Vaughn*, 491 Mich at 654; *Carines*, 460 Mich at 763. Furthermore, the evidence that defendant was the person who shot Lowe in the limo is strong, given that his DNA was found on a cigarette stub in the limo, all of the eyewitnesses identified the man wearing black as the shooter, and Etchen identified defendant as the person wearing black whom he had known for some time. Therefore, defendant is not entitled to appellate relief with respect to this issue. *Id.* at 763-764.

III. FELONY MURDER

Defendant argues that he should not have been convicted of felony murder because the evidence did not establish that the murder occurred within the res gestae of a larceny or robbery, and therefore, was not causally connected to these underlying felonies.[2] We disagree.

The trial court denied defendant's motion for a directed verdict of the felony-murder charge. We review a trial court's decision on a motion for a directed verdict by the same standard as a challenge to the sufficiency of the evidence, although only the evidence admitted up to the time the motion was made is considered. *People v Powell*, 278 Mich App 318, 320 n 1; 750 NW2d 607 (2008). We review de novo whether the evidence was sufficient to support a conviction. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). When determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014); *People v Wolfe*, 440 Mich 508, 515-516; 489

---

[2] The parties refer to the robberies as the underlying offenses to the felony-murder charge. However, the trial court instructed the jury that the underlying offense for the felony-murder charge was a larceny committed against Sheely, Zaborowski, and Stover.

NW2d 748 (1992), amended 441 Mich 1201 (1992). Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of an offense. *Carines*, 400 Mich at 757. "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015).

The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)."[3] *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). Among the felonies specifically enumerated in the statute is "larceny of any kind." "[A]t common law simple larceny was defined as the felonious taking, and carrying away, of the personal goods of another." *People v Randolph*, 466 Mich 532, 542-543; 648 NW2d 164 (2002) (quotation marks and citation omitted). Armed robbery is a larceny in which

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

Defendant argues that there is no evidence that he formed the intent to commit a larceny at or before the time of the shooting. "The felony-murder doctrine does not apply if the intent to steal the victim's property was not formed until after the homicide." *People v Orlewicz*, 293 Mich App 96, 111; 809 NW2d 194 (2011). On the other hand, " 'a murder committed during the unbroken chain of events surrounding the predicate felony is committed 'in the perpetration of' that felony.' " *Id*. "The murder and the felony need not be contemporaneous; rather, the defendant need only have intended to commit the underlying felony when the murder occurred." *Orlewicz*, 293 Mich App at 111. "[B]ecause it can be difficult to prove a defendant's state of mind on issues, such as knowledge and intent, minimal circumstantial evidence will suffice to

---

[3] MCL 750.316(1)(b) defines felony murder as:

> Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145 n, torture under section 85, aggravated stalking under section 411i, or unlawful imprisonment under section 349b.

establish the defendant's state of mind . . . ." *Henderson*, 306 Mich App at 11 (citation and quotation marks omitted). "If the evidence is nearly balanced or is such that different minds would naturally and fairly come to different conclusions, the judge may not disturb the jury findings although his judgment might incline him the other way." *People v Lemmon*, 456 Mich 625, 644; 576 NW2d 129 (1998) (citation and quotations omitted).

Although the parties cite authority to support their respective positions, the decision of *People v Gillis*, 474 Mich 105; 712 NW2d 419 (2006) is instructive on the disposition of this issue. In *Gillis*, a homeowner confronted the defendant on his premises and alerted the police, giving a description of the defendant and his vehicle. A state trooper, who had received notice of the vehicle from his dispatcher, spotted the defendant and pursued his vehicle. The defendant tried to escape and entered an expressway going the wrong way. *Id.* at 109-110. He exited that expressway and entered another, again going in the wrong direction. The defendant's car collided almost directly head on with another vehicle, killing both occupants of the other vehicle. When the trooper arrived at the scene of the accident, it was approximately 18 minutes after he received the be-on-the-lookout message from his dispatcher and approximately 10 minutes after he first spotted the defendant. *Id.* at 111. The defendant was prosecuted for two counts of felony murder, with home invasion being the predicate felony. The defendant moved to quash the information on the felony-murder charges, which the trial court denied, and moved for a directed verdict, which the court also denied. The jury convicted him of two counts of felony murder. *Id.* at 111-112.

On appeal, the *Gillis* defendant argued that the "deaths did not occur during the 'perpetration or attempt to perpetrate' the home invasion." This Court, in a split decision, determined that the "deaths were not part of the continuous transaction immediately connected to the home invasion." *Id.* (quotation marks and citation omitted). The Supreme Court disagreed, holding that "a felon has not 'carried out' or 'completed' the felony for felony-murder purposes until the felon has escaped. A murder committed during the attempt to escape is committed 'in the perpetration of' that felony, because the felonious transaction has not yet been completed." *Id.* at 116. The Supreme Court discussed the meaning of "in the perpetration of" noting that its roots are in the common law but had been adopted by statute in most of the states, including Michigan. *Id.* at 117. However, neither Michigan's original murder statute, enacted in 1838, nor the current statute defined the phrase. The Court discussed the use of the phrase "in perpetration of" by other states in the context of homicides that had occurred while the felon was attempting to escape from the predicate felony. *Id.* at 118-119. The Court stated:

> Thus, both the common law, as it was understood when the crime of murder was codified, and the clear language of MCL 750.316(1)(b) lead to the same conclusion—a murder that occurs during the uninterrupted chain of events surrounding the commission of the predicate felony is committed 'in the perpetration of' that felony for felony-murder purposes. Accordingly, we conclude that the term 'perpetration' encompasses acts beyond the definitional elements of the predicate felony, to include those acts committed within the res gestae of that felony. [*Id.* at 120-121.]

The Court in *Gillis* analyzed "what factors a jury should consider to determine if a murder has, in fact, taken place during the unbroken chain of events arising out of the predicate felony." *Id.* at 126. The Supreme Court noted:

> [C]ourts have usually required that the killing and the underlying felony be "closely connected in point of time, place and causal relation." *State v Adams*, 339 Mo 926; 98 SW2d 632 (1936). The required relationship between the homicide and the underlying felony has been summarized as being "whether there is a sufficient causal connection between the felony and the homicide depends on whether the defendant's felony dictated his conduct which led to the homicide." LaFave & Scott, [Criminal Law, § 71, p 557.]

> We hold that, to qualify as felony murder, the homicide must be incident to the felony and associated with it as one of its hazards. It is not necessary that the murder be contemporaneous with the felony. A lapse of time and distance are factors to be considered, but are not determinative. [*Gillis*, 474 Mich at 127.]

The Supreme Court further commented that Professor LaFave "has also observed that a jury should look at four factors 'in construing the scope of the expression "in the perpetration of" ': (1) time; (2) place; (3) causation; and (4) continuity of action." *Id.*, quoting 2 LaFave, Substantive Criminal Law (2d ed), § 14.5(f), p 463. The Court agreed that these factors, while not exclusive, "should be considered in determining whether there exists sufficient evidence to support a felony-murder conviction." *Id.* The Court further stated that " 'more than a mere coincidence of time and place is necessary' for a murder to qualify as a felony murder." *Id.* at 130, quoting LaFave at 465. Because the defendant in *Gillis* was attempting to escape the police following the home invasion, the Court found that all of the factors supported the jury's conclusion that the defendant was "in the perpetration of" the underlying felony, the home invasion, when the deaths occurred. His attempt to escape the police was part of the res gestae of the home invasion felony. *Id.* at 135.

In the present case, we conclude that there was sufficient evidence to support defendant's conviction of felony murder. The jury could find that the evidence showed a "causal connection" between the underlying felonies of the larcenies committed against the three friends and the murder of the limo driver. Indeed, the jury could reasonably have inferred that defendant intended to steal from the limo's occupants when he got into the vehicle, and even when he began interacting with them at the Delux Lounge and identified them as robbery targets. As the prosecution noted:

> Under this interpretation of the evidence, by the time defendant killed Lowe, he had already taken several steps toward the larcenies he ultimately committed—he had identified his victims; he had gotten into a confined space with his victims while in possession of a concealed, deadly weapon; he had isolated the victims from potential bystanders by asking the driver to drive to a deserted gas station; and then he had intimidated his intended victims into compliance by brandishing his weapon. As a result, the jury could reasonably have concluded that at the time defendant fired the fatal bullets into Lowe's body, he was well into the *res gestae* of the larcenies he was about to consummate.

Whether defendant's conduct that led to the shooting was controlled by his desire to commit a larceny or determined by his argument over a drug transaction presented an issue for the jury's determination, and under the facts and circumstances of the killing, we will not disturb its finding.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he did not receive the effective assistance of counsel at trial because trial counsel failed to object to the trial court's instructions on reasonable doubt and failure to request a jury instruction on manslaughter.

Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews any findings of fact for clear error and reviews questions of law de novo. *Id.* Here, however, defendant did not raise an ineffective-assistance claim in the trial court and this Court denied defendant's motion to remand with respect to this issue. *People v Deandre Terrel Austin*, unpublished order of the Court of Appeals, entered March 11, 2019 (Docket No. 344703). Therefore, our review is limited to errors apparent from the record. *People v Thorne*, 322 Mich App 340, 347; 912 NW2d 560 (2017).

To establish ineffective assistance of counsel, a defendant must show that counsel's performance was so objectively deficient that counsel was not performing as the attorney guaranteed to him by the Sixth Amendment. *Strickland v Washington*, 466 US 668, 687-690; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). Defendant also must establish that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 US at 691; *Pickens*, 446 Mich at 312. A defendant bears a heavy burden to overcome the assumption that he received the effective assistance of counsel. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). Counsel is afforded wide latitude in making decisions regarding trial strategy. *People v Davis*, 250 Mich App 357, 368-369; 649 NW2d 94 (2002).

Regarding defendant's argument concerning trial counsel's failure to object to the trial court's reasonable-doubt jury instructions, given our conclusion that the trial court's instructions were not erroneous, defendant's related ineffective-assistance claim cannot succeed. Counsel cannot be deemed ineffective for failing to make objections that are lacking in merit because such an objection would be futile. *People v Matuszak*, 263 Mich App 42, 57-58; 687 NW2d 342 (2004); *Hawkins*, 245 Mich App at 457.

Defendant also argues that counsel was ineffective for failing to request a jury instruction on the lesser included offense of voluntary manslaughter. The trial court must instruct the jury on lesser included offenses where there is a request to do so and where the record evidence would support a conviction of the lesser offense. *People v Moore*, 189 Mich App 315, 319; 472 NW2d 1 (1991). To establish the offense of voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions. *People v Pouncey*, 437 Mich 382, 388; 471 NW2d 346 (1991).

The evidence in this case would arguably have supported an instruction for voluntary manslaughter if one had been requested. There was evidence of an angry altercation between defendant and Devin Lowe, the homicide victim, with Lowe accusing defendant of selling him inferior cocaine and cheating him. There was unanimous testimony of the eyewitnesses that the victim "lunged" at, "rushed," or made some sort of sudden movement toward defendant before the witnesses either heard five to seven shots (Sheely, Zaborowski, and Stover) or saw the gun (Etchen). Defendant notes that trial counsel acknowledged at trial that the victim provoked the shooter, but asserts there is no explanation for counsel's failure to request a manslaughter instruction. However, the record discloses that trial counsel argued to the jury that defendant was not the person dressed in black in the limo and was not the shooter. Counsel contended that the presence of DNA from defendant, Sheely, and an unidentified third person on a cigarette stub found in the limo must have been caused by a sharing of the cigarette in the bar or on the street, which Sheely then carried back into the limo. A request for an instruction on voluntary manslaughter would have been inconsistent with the defense argument that defendant was not inside the limo and was not the shooter. Given the defense theory that defendant was not the shooter, it was not objectively unreasonable for defense counsel to forgo requesting an instruction on voluntary manslaughter.

Moreover, because the jury was presented with the option of convicting defendant of second-degree murder, but instead convicted him of the greater offense of felony murder, defendant has not shown that he was prejudiced by counsel's failure to request a manslaughter instruction. See *People v Wilson*, 265 Mich App 386, 396; 695 NW2d 351 (2005) (holding that when the jury is given the option to convict of an intermediate lesser offense and rejected it in favor of the greater offense, the defendant is unable to demonstrate prejudice from the failure to instruct on a lesser offense).

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Deborah A. Servitto