*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Contempt of SK.

TF,

Petitioner-Appellee,

v

SK,

Respondent-Appellant.

UNPUBLISHED
August 17, 2023

No. 362557
Oakland Circuit Court
LC No. 2020-503221-PH

Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Respondent appeals as of right the August 10, 2022 order finding respondent guilty of criminal contempt for violating the terms of a personal protection order (PPO). The trial court sentenced respondent to seven days imprisonment with 86 days imprisonment held in abeyance. Respondent also challenges the trial court's issuance of the underlying PPO. We affirm and remand solely for a ministerial correction to the August 10, 2022 order.

## I. BACKGROUND

This case arises from the alleged stalking of petitioner by respondent. Petitioner is the fiancée of respondent's ex-husband, RK. In October 2020, petitioner filed an ex parte petition for a nondomestic PPO against respondent under MCL 600.2950a(1). Petitioner alleged that respondent stalked, harassed, or engaged in threatening behavior toward her on several occasions. Petitioner had repeatedly directed respondent not to contact her. In October 2020, respondent sent petitioner an e-mail threatening to post libelous statements about her. Respondent said that petitioner was unfit to be a first-grade teacher or be around children, and that respondent would post this opinion on online sites, including petitioner's school district's chat room, as well a site in Ohio. Thereafter, a parent notified petitioner that respondent followed through by posting a public statement on the school's page. Respondent's post stated that petitioner was unfit to teach any

-1-

child and advised others not to put their children in her class; however, if their children were already in petitioner's class, the parents should withdraw them. Earlier, respondent sent an e-mail threatening to file a CPS report against petitioner regarding petitioner's special-needs daughter. In another e-mail, respondent made obscene statements about petitioner's daughter and RK. Respondent also sent additional e-mails to petitioner at work regarding her children and RK, at times, voicing graphic death wishes toward RK. Respondent also texted petitioner until petitioner blocked her.

The trial court issued a nondomestic PPO ex parte against respondent under MCL 600.2950a based on respondent's repeated and continued harassment of petitioner. The PPO was to remain in effect until October 19, 2021. The PPO prohibited respondent from stalking by "sending . . . other communications to petitioner" as well as "posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s," among other behaviors.

In November 2020, respondent moved to terminate the PPO, asserting that there was insufficient "reasonable cause to support" it. Respondent claimed that the e-mails she sent were directed at RK, not petitioner, but respondent recognized that she had copied petitioner on several e-mails. Respondent denied ever threatening petitioner with violence or harm, and alleged the PPO petition was an act of retaliation against respondent for filing a police report after "[RK] threatened [respondent] with a rifle in front of their daughters."

In January 2021, petitioner filed two motions for an order to show cause, alleging that respondent violated the PPO. In the first motion, petitioner alleged respondent made several social media posts mentioning petitioner and details about petitioner's employment. In the second motion, petitioner alleged respondent sent her text messages, made Facebook posts about her from a secondary account, and posted her address in a social media post. In part, respondent claimed a complaint had been filed against petitioner with the Department of Education. Petitioner alleged respondent was using fake social media profiles to pose as RK and post "personal information that only [respondent] would have access to[]."[1]

In May 2021, the trial court held a show cause hearing and entered two orders. The first order denied respondent's motion to terminate the PPO.[2] The second order found respondent guilty of criminal contempt beyond a reasonable doubt for violating the October 2020 PPO.

---

[1] The chat room posts were made in the name "Gabrielle Solis," a fictional character from the television show *Desperate Housewives*.

[2] Respondent asserts that the trial court never held a hearing on her November 2020 motion to terminate the October 2020 PPO, relying on the docket entries. After the May 2021 hearing, however, the trial court entered an order denying respondent's motion to terminate the October 2020 PPO, reflecting that respondent's motion to terminate was denied "after [a] hearing." Respondent has not provided a transcript of the May 2021 hearing.

In September 2021, the trial court sentenced respondent to 93 days in the county jail, but held that the "[b]alance of jail sentence after 7 days shall be held in abeyance[.]" The trial court further ordered respondent to "delete all fake social media accounts."

The trial court also issued a first amended nondomestic PPO against respondent under MCL 600.2950a. It not only continued to prohibit "sending . . . communications to the petitioner" and "posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s," but also added "[n]o third party contact and no social media contact."

In December 2021, and February 2022, petitioner filed motions to show cause respondent. Petitioner withdrew both motions in March 2022.

By May 2022, petitioner moved for another show cause hearing, alleging that respondent violated the PPO by impersonating a grandfather of a student in petitioner's class using the name "Bill Fauts" with an e-mail address of "billfauts@protonmail.com."[3] Fauts sent an e-mail to the Superintendent of petitioner's school district, using the e-mail address of the district's Communications Department. The e-mail reported that petitioner had posted a birthday card one of her students had made for RK on petitioner's public Instagram account. A copy of the birthday card was attached wherein RK was identified via a shortened version of his first name. Fauts expressed that he was concerned because he had "personal knowledge" of RK's full name, that RK was on Michigan's CPS Central Registry for "Michigan Child Abusers," that RK had visited petitioner's classroom, and that RK had fired a firearm inside of his home. The Communications Department staff shared the e-mail with the Human Resources Department. In turn, the Assistant Superintendent of the Human Resources Department e-mailed "Bill Fauts," copying petitioner's principal, and asking to verify Fauts's full name as well as his grandchild's name. Fauts replied to all within an hour that he did not want his grandchild implicated, inquiring whether the school's "policy was to allow dangerous individuals into the school like those on the Michigan Central Registry when they do not even have a child attending" that school. Fauts added that it was his understanding that the registry was created "to protect institutions like schools and daycares from dangerous individuals who could potentially harm" children. Fauts then indicated that he would "discuss the issue further with my daughter to see if switching to a different school is an option." After further investigation, petitioner's principal concluded that RK never visited petitioner's classroom while school was in session. And the school district's administration confirmed that "Bill Fauts" was not a family member of any student enrolled in petitioner's class. Thereafter, the Assistant Superintendent sent another e-mail to Fauts, explaining that RK was never a visitor while school was in session and that they had no reason to conduct a background check. Fauts replied to the Assistant Superintendent and petitioner's principal that RK "is in fact on this registry" and that he was "concerned about [his] grand daughter [sic] because [he had] heard 'rumors' . . . that he discharged a firearm In [sic] his house around his kids." And he "was told there was an investigation by police and CPS." Given a recent school shooting, Fauts continued that everyone "need[ed] to look for warning signs" when guns were involved. Fauts also questioned why

---

[3] "Proton Mail is an encrypted e[-]mail service based in Switzerland." See <https://proton.me/mail> (accessed August 8, 2023).

petitioner's student would make a card for someone they did not know. And Fauts wrote that he was also concerned for his grandson, who was in middle school, given that outsiders, like contractors, had access to schools, noting that he thought those working or volunteering inside schools were screened against the registry to keep children and staff safe.

Respondent replied to petitioner's motion to show cause and denied that she was "impersonating a person named Bill Fauts." Respondent wrote that she "did not send the . . . e[-] mails to the individuals" named in petitioner's motion. Further, respondent claimed it was well known in the community that RK had discharged a firearm and was on the Michigan CPS Central Registry. Consequently, respondent opined that anyone could have sent the e-mails using the name Bill Fauts.

During the first day of the hearing on petitioner's motion to show cause, RK testified that he and respondent finalized their divorce in 2017. RK denied knowing anyone named Bill Fauts, and stated he only told his best friend and his best friend's wife that he was on the Michigan Central Registry years ago. RK was confident his best friend would not have shared that information and RK had not heard any rumors or comments by anyone about him being on the registry.

Petitioner also testified. She described the e-mails from Bill Fauts as containing personal information that no one, especially the grandfather of one of her students, would know. Petitioner had about four photographs on her personal Instagram account, but was unsure whether the student's birthday card for RK was her profile picture in May 2022. Petitioner had created the account a month earlier using her initials, and she identified herself using her first name, not her last name. Petitioner had only four followers, including RK's daughter and the daughter's best friend. Petitioner followed twenty Instagram accounts, including a lot of schools. Petitioner had never discussed RK being on the registry with her coworkers, her students, or her students' parents. Outside of respondent, petitioner did not have issues with anyone else and this was the first time she was called into the principal's office despite her lengthy tenure. Petitioner was "[p]ositive" that respondent was behind the Fauts e-mails because they contained personal information, were consistent with respondent's long-term pattern of harassing behavior, and respondent's history of posting via aliases as well as fake social media profiles.

During the second day of the show cause hearing, respondent testified that it was possible someone else had sent the e-mails from Bill Fauts because many people in the community knew: (1) RK's full name, (2) that respondent and RK had been placed on the CPS Central Registry, and (3) RK had an incident involving a firearm. Respondent denied sending the e-mails from Bill Fauts. Respondent was also on the registry. As a result, when respondent was going to accompany her youngest child on a trip, a teacher contacted her and said that she could not go. Subsequently, respondent "laid back on school things because [she] didn't want it to come out."

The trial court concluded that respondent violated the PPO, stating:

> Looking at this file and the exhibits I do find [petitioner] very credible and I'm giving her testimony great weight. I find her testimony compelling and the prosecutor's argument compelling. I think that first someone had to find [petitioner's Instagram] account.

-4-

Next, someone had to tie [petitioner] to [RK]. Someone had to find [petitioner's] place of employment.

Someone had to find [petitioner's] boss. [Petitioner] doesn't use [RK's] last name at all at her school. [Petitioner] doesn't ever use [RK's] middle name or [RK's] middle initial.

Next, somebody had to know [RK] was on the Central Registration [sic]. Knew about that he had allegedly discharged a firearm in the house around his kids. All that information [petitioner] testified that based on [respondent] your habit and routine which is admissible, she has no doubt that it's you.

She said that based on—you know there was constant harassment a year after those two got together, there was the e[-]mails, the text messages, the social media that you unleashed your wrath and it got progressively worse. That you posted as her on public forums where you posted before on public forums asking parents to take their kids out of her class before. Like there is that habit and routine and the law says, our court rules say that's admissible.

And but also [respondent] I didn't hear you say you didn't do it. So I have evidence today that she believes, she has no doubts that you did it and you testified today that you didn't say you didn't do it.

But whether you did or you didn't, I do find that circumstantial evidence all points to you based on what's in the exhibits. [Petitioner], like no one follows her. Like I think she says four people follow her [on Instagram] . . . .

[B]ut who does follow [petitioner] of the four followers one is . . . your daughter . . . . [A]nd her best friend . . . .

Based on everything I just said coupled with the fact that you have done similar activities in the past, I am finding you guilty. I do think the prosecutor met the burden beyond a reasonable doubt and I find you guilty.

In August 2022, the trial court entered an order finding respondent guilty of criminal contempt and directed her to serve seven days in Oakland County Jail with 86 days of jail time held in abeyance. The order reflects the PPO was entered under MCL 600.2950. This appeal followed.[4]

---

[4] While respondent's appeal was pending before this Court, respondent filed an emergency motion for bond and to stay execution of her jail sentence with the trial court, arguing that she should be allowed to remain on bond pending adjudication of her appeal because: (1) the August 2022 order was improperly based on a PPO entered under MCL 600.2950, even though no domestic relationship existed between respondent and petitioner and (2) assuming the PPO was validly entered, the trial court erred in finding respondent was in contempt of the PPO because there was

-5-

## II. VALIDITY OF THE PPO

Respondent argues the trial court improperly entered the PPO under MCL 600.2950 because there was no domestic relationship between petitioner and respondent and the legal criteria to establish stalking had not been met.

Review of the record shows that the trial court issued both the initial October 2020 and the first amended September 2021 PPOs under MCL 600.2950a, not MCL 600.2950. Indeed, the matter was captioned with a PH-suffix, meaning it was a "personal protection proceeding[] under MCL 600.2950a whe[re] there is no domestic relationship between the parties and the respondent is not under the age of 18." See SCAO, *Michigan Trial Court Records Management Standards – Case Type Code (MCR 8.117)* (May 2021), (A)(9)(e). Thus, there is no merit to respondent's claim the trial court improperly issued any PPO under MCL 600.2950. Although the August 2022 order entered after the show cause hearing erroneously reflects that respondent was found guilty of criminal contempt for violation of the PPO under MCL 600.2950, this was a mere clerical error, see e.g., MCR 6.435(A), because the September 2021 first amended PPO, underlying the contempt order, was issued under MCL 600.2950a in a case designated as one involving a non-domestic PPO.

Respondent next challenges the issuance of the October 2020 initial PPO[5] as well as the September 2021 first amended PPO.[6] "It is well established in Michigan that, assuming competent jurisdiction, a party cannot use a second proceeding to attack a tribunal's decision in a previous proceeding." *ARM v KJL*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358859); slip op at 7 (citation and quotation marks omitted). Because respondent's current appeal involves a finding of criminal contempt for violation of the September 2021 first amended PPO, this appeal involves " 'a second proceeding' " and, as such, respondent's "claim in this appeal is a collateral attack on the . . . PPO, and for this reason alone, the claim fails." *Id*. (citation omitted). See also *In re JCB*, 336 Mich App 736, 746-747; 971 NW2d 705 (2021) (quotation marks and citation omitted) ("[T]he longstanding rule is that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. Consequently, respondent's challenge to the validity of the PPO underlying the criminal contempt is foreclosed."). Regardless, as detailed above, petitioner's initial petition described respondent's willful course of conduct involving repeated or continuing

---

insufficient evidence to tie Bill Fauts's e-mails to her. Although the trial court denied respondent's emergency motion, this Court granted her motions for immediate consideration and for bond/stay "pending resolution of this appeal or further order of this Court." *In the Matter of Contempt of SK*, unpublished order of the Court of Appeals, entered August 18, 2022 (Docket No. 362557).

[5] The trial court issued the initial PPO ex parte on October 19, 2020. Respondent moved to terminate it in November 2020. The trial court denied respondent's motion in May 2021. Respondent had 21 days to appeal that order as of right, but did not. MCR 3.709(B)(1) and MCR 7.204(A)(1). The October 2020 PPO was amended by the September 2, 2020 PPO.

[6] The trial court issued the September 2, 2021 first amended PPO after a show cause hearing. Respondent had 21 days to challenge that order, but failed to do so. MCR 3.709(B)(1) and MCR 7.204(A)(1). The first amended PPO was in effect when the motion to show cause was filed.

harassment of petitioner. Therefore, the court properly issued the PPO based upon respondent's repeated, unconsented-to contacts.

## III. INSUFFICIENT EVIDENCE

Respondent further contends that the trial court improperly found her guilty of criminal contempt because there was insufficient evidence offered at the show cause hearing to demonstrate that she violated the terms of the PPO by sending e-mails to petitioner's employer. In the alternative, even if respondent had sent the e-mails, because the PPO only prohibited contact with petitioner, respondent could not be found in contempt.

## A. STANDARDS OF REVIEW

In *In re JCB*, 336 Mich App at 747-748, this Court, in the context of a nondomestic PPO violation, recited the principles applicable to criminal contempt proceedings and appellate review:

> We review a trial court's decision to hold a party in contempt for an abuse of discretion. The nature of the contempt order and whether the contempt statute permitted the sanctions imposed are questions of law that are reviewed de novo. When examining the sufficiency of the evidence to support a criminal-contempt finding following a bench trial, this Court views the evidence presented in a light most favorable to the prosecution to determine if the elements of the crime were proven beyond a reasonable doubt. Furthermore, the trial court's factual findings in a contempt proceeding are reviewed for clear error, and we must affirm if there is competent evidence to support them. We do not weigh the evidence or the credibility of the witnesses in determining whether there is competent evidence to support the findings. Circumstantial evidence and the reasonable inferences arising from that evidence can constitute satisfactory proof of the elements. [Citations omitted.]

## B. ANALYSIS

If a PPO is violated, a petitioner may file a motion to have the respondent found in contempt of court. MCR 3.708(B)(1). In a criminal contempt proceeding "[t]he petitioner or the prosecuting attorney has the burden of proving the respondent's guilt of criminal contempt beyond a reasonable doubt . . . ." MCR 3.708(H)(3). A reasonable doubt is an " '*honestly entertained*' " doubt, which arises from a defect of knowledge or evidence. *People v Allen*, 466 Mich 86, 91-92; 643 NW2d 227 (2002), quoting *People v Stubenvoll*, 62 Mich 329, 334; 28 NW 883 (1886). Although there must be more than just "some evidence" of guilt, *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979), sufficient evidence can be established by direct evidence, circumstantial evidence, and reasonable inferences that arise therefrom. *In re Contempt of Henry*, 282 Mich App 656, 677; 765 NW2d 44 (2009).

In pertinent part, the September 2021 first amended PPO prohibits: "third party contact," "social media contact," and "posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s." In turn, MCL 750.411s states:

(1) A person shall not post a message through the use of any medium of communication, including the internet or a computer, computer program, computer system, or computer network, or other electronic medium of communication, without the victim's consent, if all of the following apply:

(a) The person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim.

(b) Posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(c) Conduct arising from posting the message would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Posting a message "means transferring, sending, posting, publishing, disseminating, or otherwise communicating or attempting to transfer, send, post, publish, disseminate, or otherwise communicate information, whether truthful or untruthful, about the victim." MCL 750.411s

> is designed to prohibit what some legal scholars have referred to as "cyberstalking by proxy" or "cyberharassing by proxy." In other words, as made plain by the statute, it is not the postings themselves that are harassing to the victim; rather, it is the unconsented contacts arising from the postings that harass the victim. In particular, the statute envisions a scenario in which a stalker posts a message about the victim, without the victim's consent, and as a result of the posting, others initiate unconsented contacts with the victim. These unconsented contacts, arising from the stalker's postings, result in the harassment of the victim. In this manner, by posting a message that leads to unconsented contact, the stalker is able to use other persons to harass the victim. [*TT v KL*, 334 Mich App 413, 441; 965 NW2d 101 (2020), quoting *Buchanan v Crisler*, 323 Mich App 163, 179-180; 922 NW2d 886 (2018).]

In petitioner's May 2022 motion to show cause, petitioner alleged that respondent, posing as an individual named Bill Fauts, claimed to be a grandfather of a child in petitioner's class and sent e-mails to her administrators. In the initial e-mail sent to the school district's communications' address, Fauts stated:

> A teacher at my grand daughter's [sic] school at Carpenter Elementary, [petitioner], put the following picture of a birthday card made by a student of hers to [RK]. This was on her public Instagram a few days ago. I have personal knowledge that [RK] is [RK's full name]. [RK] is on the Central Registry for Michigan Child Abusers and I have concerns about him being inside my grand daughter's [sic] school. I thought visitors and individuals were thoroughly screen[ed] before being allowed to go into these schools let alone the classrooms if they are not a staff member or parent? It was also my understanding that anyone on the Michigan child abuser central registry is not allowed near any school especially with young children.

In a subsequent e-mail to petitioner's Human Resources, and copied to petitioner's principal, Fauts added:

> I am concerned about my grand daughter [sic] because I have heard 'rumors' and I'll admit they are rumors that he discharged a firearm In [sic] his house around his kids. I was told there was an investigation by police and CPS.

According to petitioner, administrators confirmed that Bill Fauts was not a family member of any of the students in petitioner's class.

At the show cause hearing, RK denied knowing anyone named Bill Fauts. Years ago, RK only told his best friend and his best friend's wife that he was on the registry and RK was confident his friend had not disclosed RK's status. Petitioner testified that the e-mails from Bill Fauts contained personal information that no one would know, including RK's placement on the registry, RK's full name, petitioner's Instagram handle,[7] the details of RK and respondent's divorce, and RK's alleged firing of a weapon in his home. Petitioner stated, based on the amount of personal information contained in the e-mails, respondent's history of allegedly using aliases and fake social media profiles, and respondent's pattern of harassing behavior, respondent was responsible for sending the Bill Fauts e-mails. Respondent, however, denied sending the e-mails and asserted that the personal information about petitioner and RK was generally known to the community.

Viewing the evidence in the light most favorable to petitioner, respondent's conduct violated the first amended PPO. That PPO expressly banned respondent from posting messages through any electronic medium under MCL 750.411s and third-party contact. By e-mailing the administrators of petitioner's school, respondent improperly initiated electronic third-party contact expressly banned by the PPO. Contrary to respondent's assertion, this communication constitutes a violation of the September 2021 first amended PPO because MCL 750.411s applies to third-party communications resulting in unconsented contacts with the victim.[8] See *TT v KL*, 334 Mich App at 441.

Although respondent denied sending the e-mails, the trial court remarked that it found petitioner's testimony "very credible" and accorded it great weight. After reviewing the circumstantial evidence, the trial court further found that respondent was responsible for sending the e-mails. Because this Court does not weigh the evidence or the credibility of the witnesses, see *In re Kabanuk*, 295 Mich App 252, 256; 813 NW2d 348 (2012), and because the trial court is in a superior position to assess the witnesses' testimony, we defer to its credibility determinations. See MCR 2.613(C). Accordingly, the evidence was sufficient to permit a rational trier of fact to

---

[7] Petitioner testified that she had about four followers on her recently-created Instagram, that respondent's daughter was one of those followers, and that petitioner referred to herself using only her first name. Petitioner followed twenty accounts and had posted approximately four photographs.

[8] It is irrelevant whether the initial October 2020 PPO expressly prohibited third-party contact because the September 2021 first amended PPO was in effect on the date of the alleged violation.

find beyond a reasonable doubt that respondent violated the first amended PPO,[9] and the trial court properly found respondent guilty of criminal contempt.

Affirmed in part; remanded in part for the trial court to make a ministerial correction to its August 10, 2022 order to reflect that it was entered under MCL 600.2950a, not MCL 600.2950. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Kathleen A. Feeney

---

[9] Respondent also argues that the trial court erred when it stated that she did not deny sending the e-mails, pointing to her two written responses. Although not argued by respondent, we recognize that the hearing transcript reflects that respondent testified that she did not send the e-mails. Nevertheless, any error by the trial court in this regard was harmless because the trial court further reasoned that the circumstantial evidence presented established her guilt beyond a reasonable doubt, even if respondent denied sending the e-mails. MCR 2.613(A).